**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

JAY MANNING, in his official
capacity as Director of the
Washington Department of
Ecology; WASHINGTON
DEPARTMENT OF ECOLOGY; STATE OF
WASHINGTON,
          *Defendants-Appellants,*

and

YES ON I-297: PROTECT
WASHINGTON; BOB APPLE;
WASHINGTON PUBLIC INTEREST
RESEARCH GROUP; ADAM KLINE;
TOBY NIXON; HEART OF AMERICA
NORTHWEST,
          *Defendant-Intervenors,*

v.

FLUOR HANFORD INC.; TRI-CITY
INDUSTRIAL DEVELOPMENT COUNCIL,
     *Plaintiff-Intervenors-Appellees.*

No. 06-35613

D.C. No.
CV-04-05128-AAM

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

                    v.

JAY MANNING, in his official
capacity as Director of the
Washington Department of
Ecology; WASHINGTON
DEPARTMENT OF ECOLOGY; STATE OF
WASHINGTON,
              *Defendants,*

              and

YES ON I-297: PROTECT
WASHINGTON; BOB APPLE;
WASHINGTON PUBLIC INTEREST
RESEARCH GROUP; ADAM KLINE;
TOBY NIXON; HEART OF AMERICA
NORTHWEST,
              *Defendant-Intervenors-*
                    *Appellants,*

                    v.

FLUOR HANFORD INC.; TRI-CITY
INDUSTRIAL DEVELOPMENT COUNCIL,
     *Plaintiff-Intervenors-Appellees.*

No. 06-35664

D.C. No.
CV-04-05128-AAM

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

JAY MANNING, in his official
capacity as Director of the
Washington Department of
Ecology; WASHINGTON
DEPARTMENT OF ECOLOGY; STATE OF
WASHINGTON,
          *Defendants-Appellees,*

and

YES ON I-297: PROTECT
WASHINGTON; BOB APPLE;
WASHINGTON PUBLIC INTEREST
RESEARCH GROUP; ADAM KLINE;
TOBY NIXON; HEART OF AMERICA
NORTHWEST,
          *Defendant-Intervenors,*

v.

FLUOR HANFORD INC.,
          *Plaintiff-intervenor,*

and

TRI-CITY INDUSTRIAL DEVELOPMENT
COUNCIL,
          *Plaintiff-Intervenor-Appellant.*

No. 06-35765

D.C. No.
CV-04-05128-AAM

OPINION

Appeals from the United States District Court
for the Eastern District of Washington
Alan A. McDonald, District Judge, Presiding

Argued and Submitted
December 3, 2007—Seattle, Washington

Filed May 21, 2008

Before: M. Margaret McKeown and Richard R. Clifton,
Circuit Judges, and William W Schwarzer,* District Judge.

Opinion by Judge McKeown

*The Honorable William W Schwarzer, Senior United States District
Judge for the Northern District of California, sitting by designation.

## COUNSEL

Andrew A. Fitz, Assistant Attorney General (argued); Laura J. Watson, Assistant Attorney General; and James R. Schwartz, Assistant Attorney General; Olympia, Washington, for the defendants-appellants, cross-appellees.

Michael Jay Robinson-Dorn (argued), Katy Anne King, Ian Jeremy Mensher, and Joseph Shaughnessy, Seattle, Washington, for the intervenor-appellants.

John A. Bryson, Assistant United States Attorney (argued); Matthew J. McKeown, Acting Assistant Attorney General; Cynthia J. Morris, Assistant United States Attorney; Kenneth

C. Amaditz, Assistant United States Attorney; and David Kaplan, Assistant United States Attorney; Washington, DC, for the plaintiff-appellee.

Colin C. Deihl (argued) and Kristen S. Carney, Faegre & Benson LLP, Denver, Colorado, for the intervenor-appellee Fluor Hanford, Inc.

Matthew J. Segal (argued), Stephen A. Smith, and Michael K. Ryan, Kirkpatrick & Lockhart Preston Gates Ellis LLP, Seattle, Washington, for the intervenor-appellee, cross-appellant Tri-City Industrial Development Council.

---

**OPINION**

McKEOWN, Circuit Judge:

The Hanford Nuclear Reservation ("Hanford") in Washington is one of the largest sites in the country for the treatment, storage and disposal of radioactive and non-radioactive hazardous waste, currently storing over 53 million gallons of mixed radioactive and nonradioactive hazardous waste. During World War II, the United States government constructed Hanford to manufacture plutonium for military purposes. *In re Hanford Nuclear Reservation Litig.*, ___ F.3d ___, 2008 WL 901809, *4 (9th Cir. Apr. 4, 2008) (as amended).[1] Over the decades, the United States Department of Energy ("DOE") has disposed of approximately 450 billion gallons of contaminated water and liquid mixed waste on the site. At least one million gallons of high-level mixed radioactive and non-radioactive hazardous waste have leaked into the environment and approximately 170 miles of groundwater beneath Hanford are contaminated. In addition, tens of millions of gal-

---

[1]For almost twenty years there has been litigation over whether radioiodine from Hanford caused various cancers and life-threatening diseases in residents of the surrounding area.

lons of waste are stored at Hanford in tanks that were constructed in the 1940s and meant to last only twenty years. As of 2004, there was a backlog of over 22,000 cubic meters of low-level mixed waste and transuranic mixed waste awaiting treatment and disposal.

In 1989, Washington's Department of Ecology ("Ecology"), the DOE, and the United States Environmental Protection Agency ("EPA") entered into the Hanford Federal Facility Agreement and Consent Order, also known as the Tri-Party Agreement, to bring Hanford into compliance with federal and state environmental laws. However, according to Ecology, since signing the agreement, the DOE and its contractors have been cited numerous times for violations of federal and state hazardous and mixed waste laws and requirements.

The present appeal arises out of an effort by Washington voters "to prevent the addition of new radioactive and hazardous waste to the Hanford nuclear reservation until the cleanup of existing contamination is complete." *United States v. Hoffman*, 116 P.3d 999, 1001 (Wash. 2005). Although the desire to take action against further environmental contamination and to protect the health and welfare of the community is understandable, we conclude that the statute enacted through the passage of Initiative 297 ("I-297"), the Cleanup Priority Act ("CPA"), is preempted by federal law. This result is dictated by a plain reading of the Washington statute, as interpreted by the Washington Supreme Court, as well as longstanding principles of federal preemption.

## I.  BACKGROUND

### A.  GLOSSARY

The field of environmental law has spawned multiple acronyms. Many of these acronyms are well recognized, like EPA,

while others, like HWMA, are not. For ease of reference, we offer the following glossary of terms:

| | | |
|---|---|---|
| AEA | Atomic Energy Act of 1954 | 42 U.S.C. §§ 2011-2259 |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act of 1980 | 42 U.S.C. §§ 9601-9675 |
| CPA | Cleanup Priority Act | RCW Chapter 70.105E |
| DOE | United States Department of Energy | |
| EPA | United States Environmental Protection Agency | |
| Ecology | Washington State Department of Ecology | |
| FFCA | Federal Facility Compliance Act of 1992 | Pub. L. No. 102-386, 106 Stat. 1505 (codified in scattered sections of 42 U.S.C.) |
| HWMA | Hazardous Waste Management Act | RCW Chapter 70.105 |
| MTCA | Model Toxics Control Act | RCW Chapter 70.105D |
| RCRA | Resource Conservation and Recovery Act of 1976 | 42 U.S.C. §§ 6901-6992k |

### B. STATUTORY FRAMEWORK FOR HAZARDOUS WASTE MANAGEMENT

Hazardous waste is regulated at both the federal and state levels. The Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k, enacted in 1976 in response to the environmental and public health risks associated with the mismanagement of hazardous waste, created a permit scheme for the treatment, disposal, or storage of hazardous waste. *See id.* § 6925(a); *United States v. Kentucky*, 252 F.3d 816, 822 (6th Cir. 2001). Under the RCRA, states may apply to the EPA for authorization to administer a hazardous waste program in lieu of the federal program. 42 U.S.C. § 6926(b). Washington is authorized to administer its own program, and does so through the Hazardous Waste Management Act ("HWMA"), RCW 70.105.

Despite federal cleanup efforts, hazardous waste contamination continued to be a problem. Ecology claims that federal facilities, including Hanford, were among the worst offenders. In 1992, Congress enacted the Federal Facilities Compliance Act ("FFCA") to make it "as clear as humanly possible" that Congress was waiving federal sovereign immunity and making federal facilities subject to state laws. 138 Cong. Rec. H9135-02 (daily ed. Sept. 23, 1992) (statement of Rep. Dingell); *see* 42 U.S.C. § 6961. This act also added a provision to the RCRA that requires the DOE to submit its treatment plans for mixed waste to the states for approval, modification, or disapproval. 42 U.S.C. § 6939c.

Disposal of nuclear and radioactive materials falls into a special category and is separately regulated by the federal government. Thus, "solid waste" regulated by the RCRA does not include "source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954."[2] 42 U.S.C.

---

[2]"Source material" includes uranium, thorium, and other materials that the Nuclear Regulatory Commission deems necessary for the production

§ 6903(27). "The [Atomic Energy Act, ("AEA"), 42 U.S.C. §§ 2011 2259] enacted in 1954, established a comprehensive regulatory scheme for military and domestic nuclear energy." *Natural Res. Def. Council v. Abraham*, 388 F.3d 701, 704 (9th Cir. 2004). Amendments to the AEA in 1959 gave states some regulatory authority, but the Atomic Energy Commission, now the Nuclear Regulatory Commission, "retain[ed] exclusive regulatory authority over 'the disposal of such . . . byproduct, source, or special nuclear material as the Commission determines . . . should, because of the hazards or potential hazards thereof, not be disposed of without a license from the Commission.' "[3] *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 250 (1984) (quoting 42 U.S.C. § 2021(c)(4)).

Radioactive waste that is subject to regulation under the AEA frequently may be mixed with non-radioactive waste that is regulated by the RCRA. No separate federal statute regulates this "mixed waste."[4] *See Kentucky*, 252 F.3d at 822. However, the DOE and the EPA have issued rules stating that mixed waste will be subject to dual regulation: the AEA will

of special nuclear material. 42 U.S.C. § 2014(z). "Special nuclear materials" are those materials, such as plutonium and enriched uranium, that are "enriched in the isotope 233 or in the isotope 235." *Id.* § 2014(aa). "Byproduct material" includes "(1) any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material, and (2) the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." *Id.* §§ 2014(e)(1), (2).

[3]Source material, special nuclear material, and byproduct material are often referred to as "AEA materials."

[4]The State suggests that the RCRA and the FFCA give states the authority to regulate the radioactive component of mixed waste. Neither federal statute explicitly allows states to engage in broad regulation of the radioactive component of mixed waste. The FFCA gives states a limited role in mixed waste management by directing the DOE to submit plans regarding mixed waste to states for approval, modification, or disapproval. 42 U.S.C. § 6939c; *see also* H.R. Conf. Rep. No. 102-866, at 22 (1992). Congress stopped short, though, of giving states broader regulatory authority.

govern the radioactive component and the RCRA or comparable state legislation will govern the non-radioactive component. *See, e.g.*, 51 Fed. Reg. 24,504 (July 7, 1986); 52 Fed. Reg. 15,937 (May 1, 1987); 53 Fed. Reg. 37,045 (Sept. 23, 1988). This dual regulatory structure is the source of the conflict engendered by the CPA.

## C.   The Cleanup Priority Act

The ballot description of I-297 declared that "[t]his measure would add new provisions concerning 'mixed' radioactive and nonradioactive hazardous waste, requiring cleanup of contamination before additional waste is added, prioritizing cleanup, [and] providing for public participation and enforcement through citizen lawsuits." Thus, the CPA "became part of a complex state and federal system for regulating materials that are variously described as hazardous, dangerous, radioactive, or having some combination of these attributes." *Hoffman*, 116 P.3d at 1001. Counsel explained at oral argument that the CPA, passed by Washington voters in November 2004, was meant to eliminate Ecology's discretion in issuing permits under the RCRA and the HWMA and in taking action regarding investigation and cleanup.

Toward those ends, § 4 of I-297 provides that a final facility permit cannot issue until all units of a facility are in compliance with federal and state cleanup laws. Significantly, a facility cannot import mixed waste until it obtains a final facility permit. Section 5 requires that Ecology take remedial and corrective action against releases of radionuclides into the environment. Section 6 contains mandates to Ecology regarding the investigation and cleanup of hazardous substances that have been disposed of in unlined trenches, and the closure of mixed waste tank systems. Section 7 requires Ecology to obtain from mixed waste facility owners the projected costs of remedial and corrective actions. Section 8 grants exemptions from the CPA's requirements for certain naval waste, in accordance with the State's obligations under the Northwest

Interstate Compact. Section 9 requires facilities where there has been a release of mixed waste to provide for and fund a broadly representative advisory board, and directs Ecology to make available public participation grants that will be funded by a mixed waste surcharge assessed against permit applicants and permit holders. Finally, under § 10, the CPA is enforceable through citizen suits.

The United States sought and obtained a temporary restraining order in federal district court against the enforcement of the CPA the day before its effective date, December 2, 2004.[5] Various sponsors of I-297 intervened as defendants ("Sponsors"). The United States argued that the CPA was invalid in its entirety because it violated the Supremacy Clause and the Commerce Clause of the United States Constitution, and the sovereign immunity of the United States. Fluor Hanford ("Fluor"), a private contractor operating at Hanford, intervened as a plaintiff. The Tri-City Industrial Development Council ("TRIDEC"), a not-for-profit corporation that represents local businesses and public entities in the area around Hanford, also intervened as a plaintiff and asserted that the CPA violated the Contract Clause.

## D.　QUESTIONS CERTIFIED TO THE WASHINGTON STATE SUPREME COURT

The United States and Fluor filed for summary judgment and TRIDEC filed for partial summary judgment. In opposing the United States' motion, the State argued that many of the claims could be narrowed or eliminated through statutory interpretation. *See Hoffman*, 116 P.3d at 1001. The parties agreed that if the CPA covered only material that could be regulated under state law or the RCRA, then the statute was not preempted by federal law. The district court granted the State's motion to certify five questions to the Washington

[5]Ultimately, the parties agreed to extend the temporary order until the district court ruled on a motion for summary judgment.

Supreme Court, including the following question and its sub-parts that are directly relevant to this appeal:

> (1)   What materials are encompassed within the definition of "mixed waste" set forth in Section 3(9) of the CPA [RCW 70.105E.030(9)]?
>
> (a)   Specifically, does the definition of "mixed waste" encompass materials that consist solely of radioactive source, special nuclear, or byproduct materials and, if so, under what circumstances does the CPA apply to such materials?
>
> (b)   Specifically, does the definition of "mixed waste" encompass materials that are mixtures of radioactive source, special nuclear, or byproduct materials and other hazardous substances that do no[t] designate as "dangerous waste" under state laws? If so, under what circumstances does the CPA apply to such materials?
>
> (c)   Specifically, does the definition of "mixed waste" encompass materials that are not "solid wastes" under the Resource Conservation and Recovery Act (RCRA) and, if so, under what circumstances does the CPA apply to such materials?
>
> (d)   In light of the Court's answers to subparts (a) through (c), above, does the definition of "mixed waste" expand the scope of materials regulated as mixed waste under the Washington Hazardous Waste Management Act (HWMA) and RCRA?

*Id.* at 1001-02.

The Washington Supreme Court accepted certification and, among others, answered Question 1. The court began its analysis by tracing the definition of "mixed waste," as used in the

CPA, through its cross-references to other federal and state statutes. *See id.* at 1003-04. Under the CPA, "mixed waste" is defined as:

> [A]ny hazardous substance or dangerous or extremely hazardous waste that contains both a non-radioactive hazardous component and a radioactive component, including any such substances that have been released to the environment, or pose a threat of future release, in a manner that may expose persons or the environment to either the nonradioactive or radioactive hazardous substances.

RCW 70.105E.030(9). The court observed that the CPA's definition of "mixed waste" incorporated the term "hazardous substance," which is, in turn, defined as having "the same meaning as the term is defined in [the Model Toxics Control Act ("MTCA"), RCW 70.105D.020]."[6] *Hoffman*, 116 P.3d at 1003. The MTCA is " 'designed to deal both with the remediation of former environmental hazards and to prevent

---

[6]Under the MTCA, "hazardous substance" is defined as:

(a) Any dangerous or extremely hazardous waste as defined in RCW 70.105.010(5) and (6), or any dangerous or extremely dangerous waste designated by rule pursuant to chapter 70.105 RCW;

(b) Any hazardous substance as defined in RCW 70.105.010(14) or any hazardous substance as defined by rule pursuant to chapter 70.105 RCW;

(c) Any substance that, on March 1, 1989, is a hazardous substance under section 101(14) of the federal cleanup law, 42 U.S.C. Sec. 9601(14):

(d) Petroleum or petroleum products; and

(e) Any substance or category of substances, including solid waste decomposition products, determined by the director by rule to present a threat to human health or the environment if released into the environment.

RCW 70.105D.020(10).

environmental hazards in the future,' " and makes a property owner " 'strictly liable for the remediation of environmental hazards caused by hazardous substances it released [or were released] on its property.' " *Goodstein v. Cont'l Cas. Co.*, 509 F.3d 1042, 1046 n.2 (9th Cir. 2007) (quoting *Olds-Olympic, Inc. v. Commercial Union Ins. Co.*, 918 P.2d 923, 927 (Wash. 1996)). The MTCA's definition of "hazardous substance," in turn, cross-references the definition of "hazardous substance" in the HWMA, RCW 70.105D.020(7)(b).[7] *Hoffman*, 116 P.3d at 1003.

As to Question 1(a), the parties agreed that the CPA does not address materials that are solely "of radioactive source, special nuclear, or byproduct materials." *Id.* In response to Question 1(b), the court concluded that the CPA's definition of "mixed waste" includes material that does not designate as "dangerous waste" under the MTCA and the HWMA. *Id.* at 1005. Waste must meet certain threshold quantity requirements of certain materials before it will designate as "dangerous waste," *id.* at 1004; WAC 173-303-090(8)(a)-(c), but a "hazardous substance," as defined by the HWMA, has no threshold requirement. *Hoffman*, 116 P.3d at 1004; RCW 70.105.010(14). Because the HWMA's definition of "hazardous substance" is incorporated into the CPA's definition of "mixed waste," "mixed waste" can include materials that will not designate as "dangerous waste" because those materials do not meet the threshold quantity requirement.

With respect to Question 1(c), the court concluded that the CPA's definition of "mixed waste" included materials that were not "solid waste" under the RCRA. *Hoffman*, 116 P.3d

---

[7]Under the HWMA, "hazardous substances" are defined as:

> [A]ny liquid, solid, gas, or sludge, including any material, substance, product, commodity, or waste, regardless of quantity, that exhibits any of the characteristics or criteria of hazardous waste as described in rules adopted under this chapter.

RCW 70.105.010(14).

at 1006. In light of its analysis of questions 1(a)-(c), the Washington Supreme Court held that "the CPA does expand the scope of materials currently subject to regulation as mixed waste beyond the HWMA and the RCRA." *Id.* at 1006 (responding to Question 1(d)).

## E. THE DISTRICT COURT'S DECISION

The district court addressed the motion for summary judgment in a careful and extensive (sixty-page) order. Relying on the Washington Supreme Court's conclusions that the CPA's definition of "mixed waste" includes materials that do not designate as "dangerous waste" and materials that are not "solid waste" under the RCRA, the district court held that the CPA was preempted by federal law because it improperly intruded on the field governed by the AEA by regulating byproduct, source, or special nuclear material. The court further held that specific provisions of the statute violated federal sovereign immunity and the Commerce Clause. In addition, the court granted TRIDEC's motion for partial summary judgment and held that the CPA also violated the Contract Clause. The court denied TRIDEC's motion for attorney's fees under 42 U.S.C. § 1988, which is the subject of its cross-appeal. We review de novo the district court's rulings on summary judgment. *Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004).

## II. ANALYSIS

Generally speaking, "mixed waste" is waste that has both a nonradioactive hazardous component and a radioactive component. Unquestionably, the State has the authority to regulate nonradioactive hazardous materials, and does so primarily through the RCRA and the HWMA. The parties also agree that the regulation of pure radionuclides is governed by the AEA. The question we address here is whether the regulation of the radioactive component of mixed waste is preempted by the AEA.

## A.   FIELD PREEMPTION

**[1]** As the Supreme Court observed, state law can be pre-empted in either of two general ways: if "Congress evidences an intent to occupy a given field," or, if the field has not been occupied entirely, "to the extent it actually conflicts with federal law . . . or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood*, 464 U.S. at 248. In a landmark case involving nuclear regulation, the Court declared that "the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983). To determine whether the CPA is preempted by the AEA, "the test . . . is whether 'the matter on which the state asserts the right to act is in any way regulated by the federal government.' " *Id.* at 213 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 236 (1947)). The AEA preempts the CPA if (1) the purpose of the CPA is to regulate against radiation hazards, or (2) if the CPA directly affects decisions concerning radiological safety. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 84 (1990). We hold that the CPA is preempted on both grounds.

The district court concluded that the CPA intruded into the AEA field because its purpose was to regulate the safety of radionuclides. Relying on the Washington Supreme Court's analysis, it held that "[t]he CPA exceeds RCRA authority and, as such, intrudes upon a field (regulation of AEA radionuclides for radiological safety purposes), which is preempted by the AEA." *See* 42 U.S.C. §§ 6903(5), (27). The court noted that "[t]he CPA makes the presence of radioactive materials, whether or not a component of 'mixed waste,' as defined by the CPA, the trigger for all of its requirements." As a further basis for preemption, the district court's order listed eight ways in which the CPA would have a "direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels[.]"

## 1. The CPA's Purpose is to Regulate Radioactive Materials

The CPA is preempted because it regulates within the field that is occupied by the AEA.[8] It is abundantly clear from the text of the CPA that it is intended to regulate both nonradioactive hazardous substances and radioactive hazardous substances in order to protect health and environmental safety.

[2] The "Policy" section of the CPA, which corresponds to § 2 of I-297, is telling as to the State's intent to regulate radioactive safety. Section 2(1) describes Hanford as a dump for "radioactive *and/or* hazardous or toxic wastes[.]" RCW 70.105E.020(1) (emphasis added). Subsection 4 warns that Washington's economy could be harmed "from any accident *releasing radiation*[.]" RCW 70.105E.020(4) (emphasis added). Subsection 6 expresses the state policy of protecting residents from cancer-causing substances, "including radionuclides[.]" RCW 70.105E.020(6).

[3] The substantive provisions of the statute also squarely regulate both the nonradioactive and radioactive components of hazardous waste. For example, the first sentence of § 4(2) states:

> Any facility owner or operator of a site storing, managing, processing, transferring, treating, or disposing of mixed wastes shall apply for and obtain a final facility permit under [the HWMA], this chapter, and

---

[8]Because the CPA is invalid under the Supremacy Clause, we do not need to reach the additional constitutional challenges. Although we do not reach the issue of sovereign immunity or the challenges under the Commerce Clause and the Contract Clause, we decline to vacate those portions of the district court's order as the State requests. Rather, we simply express no view on issues unnecessary to this opinion. *See Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 754 (2d Cir. 1996) (declining a request to vacate an alternative basis for the judgment below).

[RCRA], before transporting to, storing or disposing at, the facility any additional mixed wastes not generated at the facility.

RCW 70.105E.040(2). This section imposes a condition on the ability of facility owners to accept mixed waste that is generated off-site. Simply because the permit is issued under the RCRA does not require the term "mixed waste" to be interpreted in a way that excludes the radioactive component, an interpretation that would be at odds with the interpretation of the Washington Supreme Court. Similarly, § 6(1) directs Ecology to order "site" owners and operators where "mixed wastes" are believed to be disposed to cease disposal and initiate investigations. RCW 70.105E.060(1)(a).

[4] Some provisions in the CPA regulate "pure" AEA radionuclides. For example, under § 4(6)(b), Ecology is directed to not issue or modify a permit if there has been a release of radionuclides at the site or facility. RCW 70.105E.040(6)(b). Section 5 requires Ecology to "consider releases . . . of radioactive substances or radionuclides as hazardous substances" and to "require corrective action for, or remediation of, such releases[.]"[9] RCW 70.105E.050(1).

[5] The purpose of the CPA is evident in these provisions: to regulate the treatment, storage, and disposal of radioactive

---

[9]The State argues that § 5(1) only regulates radiological safety in the context of environmental releases and, therefore, is outside the scope of the AEA and consistent with permissible state regulation under CERCLA. Through CERCLA, Congress allows states to apply their "laws concerning removal and remedial action" to federally-owned facilities. 42 U.S.C. § 9620(a)(4). However, § 5(1) directs Ecology to "require corrective action for, or remediation of" releases of radioactive substances. RCW 70.105E.050(1). "Corrective action" is not defined in the CPA, but is a term that is used in connection with the RCRA. *See* 42 U.S.C. § 6924. Because radioactive materials are excluded from the RCRA, requiring a corrective action for the release of radionuclides exceeds the authority of the RCRA.

materials, among other materials, in order to protect the health and safety of Washington residents and the environment. Such regulation, however laudable its purpose, invades the province of the AEA.

The Sixth Circuit's decision in *United States v. Kentucky* is particularly instructive. 252 F.3d at 816. There, the court addressed whether the AEA preempted state permit conditions on the disposal of radioactive waste in a landfill. The conditions prohibited the DOE from placing solid waste with more than a de minimis amount of radioactivity in a landfill and further prohibited the DOE from disposing of solid waste that contained radionuclides in a landfill without approval from Kentucky's Division of Waste Management. *Id.* at 820. The court noted that these permit conditions "specifically limit the amount of 'radioactivity' and 'radionuclides.' " *Id.* at 823. It explained that the state "seeks to impose these conditions to protect human health and the environment. The permit conditions therefore represent an opportunity by the [state] to regulate materials covered by the AEA based on the [state's] safety and health concerns, and are thus preempted." *Id.*

As in *Kentucky*, the State here seeks to impose conditions on the disposal of AEA materials out of concern for the health and environmental risks that increased contamination will cause. This type of regulation falls squarely within the field preempted by the AEA.

The State attempts to sidestep the preemption issue by shifting the applicable definitions, contending that it is reasonable to read "mixed waste" within the operative provisions of the CPA as limited to the materials that may be regulated under the RCRA and the HWMA. This construction is neither reasonable nor legally permissible.

The State's argument fails at the outset because we are bound by the Washington Supreme Court's opinion that

"mixed waste" includes more than the materials regulated under the RCRA and the HWMA. *See Reinkemeyer v. Safeco Ins. Co. of Am.*, 166 F.3d 982, 984 (9th Cir. 1999) (explaining that "[w]e are bound by the answers of state supreme courts to certified questions just as we are bound by state supreme court interpretations in other contexts."). The Supreme Court has explained that "state courts are the ultimate expositor of state law [and] we are bound by their constructions except in extreme circumstances[.]" *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). In other words, the State cannot re-litigate its argument that "mixed waste" should be read narrowly without invoking one of the "few established grounds for disregarding a state court interpretation of state law." *Reinkemeyer*, 166 F.3d at 984. The State does not point to any "obvious subterfuge to evade consideration of a federal issue" or a "violation of federal law" that could undercut the Washington Supreme Court's analysis. *See Mullaney*, 421 U.S. at 691 n.11; *Reinkemeyer*, 166 F.3d at 984.

The State's position is somewhat curious because it was at the State's urging that the district court certified to the state supreme court questions that would determine whether "mixed waste" included substances that were not regulated under the RCRA or the HWMA. *See Hoffman*, 116 P.3d at 1001-02. The court answered in the affirmative. *Id.* at 1006. In arriving at this construction, the court rejected the arguments that the State and the Sponsors advance now that "the CPA's reference to 'hazardous substances' is *necessarily* limited to only those materials that have been released or pose a threat of release [making] the CPA . . . coextensive with the HWMA and the RCRA." *Id.* at 1004 (emphasis in original). The court refused to "ignore the direct cross-references incorporating the expansive definition of 'hazardous substances' in RCW 70.105.010(14)." *Id.* "Ecology's contention that the word 'waste' limits the application of otherwise clear and unequivocal statutory definitions to circumstances of 'release or threatened release' is wholly without merit." *Id.* The court pointedly noted that it was "left with a choice between two

alternatives": "a plain language interpretation based on the statutory definitions of 'mixed waste' and 'hazardous substance," as espoused by the United States, or Ecology's position which would "artificially eliminate much of the substance of these definitions." *Id.* at 1005. In the end, Ecology's "artificial limitation would require [the court] to ignore long-held rules of statutory interpretation." *Id.*

The State now argues that, under *Salerno*, we cannot invalidate a statute as unconstitutional if there is a reasonable, constitutional construction. It is equally true, though, that we cannot rewrite the statute to impose an artificial, unreasonable definition, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988); *United States v. Buckland*, 289 F.3d 558, 564 (9th Cir. 2002) (en banc), nor can we hold that the CPA is co-extensive with the RCRA and the HWMA when the state supreme court has expressly ruled otherwise.

**[6]** A key purpose of the CPA is to regulate the radioactive component of mixed waste, as well as the nonradioactive component, for health and safety reasons. Accordingly, the CPA is preempted by the AEA. Except for "limited powers ceded to the states," and not disputed here, "the federal government has occupied the entire field of nuclear safety concerns." *Pac. Gas & Elec.*, 461 U.S. at 212.

## 2. Direct and Substantial Effects

**[7]** The CPA is also preempted because it directly and substantially impacts the DOE's decisions on the nationwide management of nuclear waste. *See English*, 496 U.S. at 85. According to the declaration of Dr. Ines Triay, Chief Operating Officer for Environmental Management at the DOE, Hanford figures prominently in the DOE's waste management plan. Hanford is the only federal facility that can accept off-site mixed low level waste for disposal. The use of commercial facilities for disposal is limited because their long-term availability is uncertain and because commercial licenses pre-

clude the facilities from accepting higher-activity mixed low-level waste, classified waste, and other types of waste. The DOE's National Laboratories plan to dispose of their waste at Hanford because that waste is too radioactive to be sent to a commercial facility, or is classified. Hanford is the only viable option for some sites with higher-activity mixed low-level waste.

In particular, the Navy disposes of radioactive waste (which also contains hazardous substances, as defined by the CPA) that is generated through the maintenance and repair of nuclear powered ships at shipyards in Washington at Hanford. If Hanford was unavailable, it is possible, but "uncertain," whether the Navy can dispose of the waste at another site.

[8] The district court enumerated eight different direct and substantial effects that flow from the CPA.[10] It wrote that "the defendants do not deny that these things happen, but assert there is no guarantee they will depending on the State's interpretation and implementation of the CPA." Yet again, the State tries to hide behind an as-yet-to-be-determined interpretation and implementation of the statute when the state supreme court has already laid out, in binding terms, the scope of the CPA. Finally, the State's contention that the CPA does not have a direct and substantial effect on the DOE's decision-making because the DOE is not currently shipping waste to Hanford misses the point. The facilities at Hanford are part of the DOE's overall nuclear waste management plan. Legislation geared to effectively close Hanford for an extended period of time directly affects the DOE's ability to make decisions regarding if and when it will ship additional

---

[10]For example, the district court explained that the CPA would have the direct and substantial effect of prohibiting the Navy from sending certain classified nuclear waste to Hanford, trump DOE decision-making with respect to the cleanup and disposal of AEA radionuclides, including any expansion of any land disposal unit for radionuclides, and prevent the DOE from using methods it deems appropriate for closing tanks that contain AEA radionuclides.

waste to Hanford. Because of these direct and substantial effects, the CPA is preempted.

## B. SAVINGS CLAUSE

[9] The CPA contains a savings clause that authorizes Ecology to "regulate mixed wastes to the fullest extent it is not preempted by federal law[.]" RCW 70.105E.040(1). Regulation of the radioactive component of mixed waste is preempted by federal law. The CPA regulates mixed waste as a whole and certain provisions contain specific mandates concerning the radioactive component. The definitional cross-references and intersection with multiple state and federal statutes make the CPA a complex regulatory web. For example, in the CPA, the focus is on "mixed waste," without distinguishing the radioactive component from the "hazardous" component, and yet the HWMA focuses on "hazardous waste," even where it is a component of "mixed waste."

[10] Although it might be possible to excise those provisions that deal solely with radioactive materials, to construe the remaining sections of the CPA as limited to the nonradioactive component would require us to examine and rewrite most of the statute in a vacuum as to how the various provisions were intended to intersect and in a way that would be at odds with the purpose of the statute. *See Alaska Airlines v. Brock*, 480 U.S. 678, 684 (1987) (" 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' ") (quoting *Buckley v. Valeo*, 424 U.S. 1, 108 (1976) (per curiam)). We will not undertake this task of unscrambling the egg. *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 937 (9th Cir. 2004) (noting the court's "previously expressed concern that federal courts ought not be redrafting state statutes at the level of individual words"). And, as a practical matter, excising the most signifi-

cant conflicts in the statute would result in a very difficult statute than the one envisioned by I-297.

**[11]** The CPA is preempted by the AEA because its purpose is to regulate AEA materials for safety purposes and because the CPA has a direct and substantial effect on the DOE's ability to make decisions regarding the disposal of radioactive hazardous waste. The district court's grant of summary judgment to the United States, Fluor, and TRIDEC is affirmed.

## III.   TRIDEC'S CROSS-APPEAL FOR ATTORNEY'S FEES

**[12]** TRIDEC's cross-appeal challenges the district court's denial of its motion for attorney's fees under 42 U.S.C. § 1988. The district court resolved this case under the Supremacy Clause, holding that "the CPA is field preempted and facially invalid as a whole." We have affirmed that result. Attorney's fees are not available in an action under the Supremacy Clause. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989). The district court also identified other deficiencies and addressed the Commerce Clause and Contract Clause arguments, but only as alternative holdings and to avoid piecemeal appeal. In addition, the court noted that the judgment had not changed the legal relationship among the parties, as the State "had taken no action in the first instance to enforce the CPA against the members of TRIDEC." *See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782-792 (1989) (holding that to be considered a prevailing party under § 1988, there must be "a resolution of the dispute which changes the legal relationship" between the plaintiff and the defendant). The district court's denial of TRIDEC's motion for attorney's fees is affirmed.

   **AFFIRMED.**