**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

THE BOEING COMPANY,
    *Plaintiff-Appellee*,


v.

MAZIAR MOVASSAGHI, in his official
capacity as the Acting Director of
the California Dept. Of Toxic
Substances Control; LEONARD
ROBINSON, in his official capacity as
the Acting Director of the California
Dept. Of Toxic Substances Control,
    *Defendants*,


and

DEBBIE RAPHAEL, in her official
capacity as the Acting Director of
the California Dept. Of Toxic
Substances Control,
    *Defendant-Appellant*.

</td>
<td>

No. 11-55903

D.C. No.
2:10-cv-04839-
JFW-MAN


OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Submitted May 31, 2013[*]
Pasadena, California

Filed September 19, 2014

Before: Alfred T. Goodwin, Andrew J. Kleinfeld,
and Barry G. Silverman, Circuit Judges.

Opinion by Judge Kleinfeld

## SUMMARY[**]

### Environmental Law

The panel affirmed the district court's decision that a California law governing cleanup of a federal nuclear site violated the doctrine of intergovernmental immunity.

The Boeing Co. challenged the validity of California's Senate Bill 990, which prescribes cleanup standards for radioactive contamination at Santa Susana Field Laboratory. SB 990 requires that the site be made suitable for subsistence farming, a more demanding standard than that imposed by a plan adopted by the federal Department of Energy.

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that Boeing had standing because as landowner, it established injury in fact.

The panel held that SB 990 violated the doctrine of intergovernmental immunity because it regulated DOE's cleanup activities directly in violation of the Supremacy Clause. In addition, SB 990 discriminated against the federal government and Boeing as a federal contractor hired to perform the cleanup of the Santa Susana site.

The panel did not reach the question of whether the federal laws governing nuclear materials and cleanup of hazardous substances preempted the state law. It also did not reach Boeing's claim under 42 U.S.C. § 1983 for a declaratory judgment and an injunction.

---

**COUNSEL**

Brian W. Hembacher, Supervising Deputy Attorney General, Los Angeles, California, for Defendant-Appellant.

Randolph D. Moss, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for Plaintiff-Appellee.

Daniel P. Selmi, Los Angeles, California, for Amici Curiae Southern California Federation of Scientists, Los Angeles Chapter of Physicians for Social Responsibility, Rocketdyne Cleanup Coalition, and Committee to Bridge the Gap.

David C. Shilton, United States Department of Justice, Washington, D.C., for Amicus Curiae United States.

---

**OPINION**

KLEINFELD, Senior Circuit Judge:

We affirm the district court's decision that a California law governing cleanup of a federal nuclear site violates the doctrine of intergovernmental immunity. Because we decide that the state law impermissibly regulates and discriminates against the federal government and its contractor, we do not reach the question of whether the federal laws governing nuclear materials and cleanup of hazardous substances preempted the state law. We need not reach Boeing's Section 1983 claim for a declaratory judgment and an injunction.

**FACTS**

The federal government made and tested rockets, nuclear reactors, and various nuclear applications for war and peace at the Santa Susana Field Laboratory beginning shortly after World War II. When built in the 1940s, this lab was far from people, thirty miles from Los Angeles in Ventura County. Los Angeles grew, though, and now over 150,000 people live within five miles of the site and half a million people live within ten miles.

When the state law challenged in this case was promulgated, 452 acres of the 2,850 acre lab site were federally owned and managed by the National Aeronautics and Space Association ("NASA"). Most of the site, the remainder, was owned by Boeing, a defense contractor, which acquired the land from another defense contractor, Rockwell International Corporation, in 1996. Rockwell International and its predecessor, North American Aviation, had occupied or owned the land since 1947. (For

convenience, we refer to Boeing and its predecessors, Rockwell International and North American Aviation, as "Boeing.") Since the 1950s, the federal Department of Energy ("DOE") and its predecessor agencies have leased 90 acres of the site from Boeing, where it built and operated 16 nuclear reactors of various sorts and over 200 facilities for nuclear research.

These two federal agencies, DOE and NASA, hired Boeing to assist in the nuclear research and rocket testing. Most of Boeing's work was as a contractor on behalf of the federal government, though it also did some commercial work on its own account at the site. Boeing operated one commercial nuclear reactor under a license from the Atomic Energy Commission. It also handled what the California statute calls "radiological contaminants" under licenses from the State of California to perform activities involving the use of x-ray machines, calibration devices, gas chromatographs, smoke detectors, and various gauges.

All this work created a terrible environmental mess. It also created tremendous benefits, for war and peace, but the government's work unarguably imposed tremendous harm to the environment. The soil, ground water, and bedrock were seriously contaminated. Disasters and foolishness added to the environmental harm.

In 1959, one of the reactors experienced a partial meltdown that released radioactive gases into the atmosphere for three weeks. This partial meltdown accounts for about 90% of the radioactive contamination. Much of the rest came from other nuclear reactor accidents, an open burn pit for sodium-coated materials, and numerous fires and accidents at the "Hot Lab." The "Hot Lab" was used for cutting up spent

nuclear fuel from the site's reactors and spent fuel shipped to the lab from elsewhere in the United States. Radioactive material was also dumped at various locations around the site. One disposal procedure consisted of shooting barrels of toxic substances with shotguns to make them explode and burn.

The federal government, not Boeing, appears from the record to be responsible for the radioactive pollution. Though Boeing conducted some commercial nuclear work at the site, no radioactive contamination has been traced to Boeing's private activity. It is undisputed in this case that the site's radioactive contamination either resulted from federal activity or is indistinguishable from federal contamination.

That is not to suggest that the pollution was merely wanton. The United States Air Force and NASA used the site to test rocket engines for ballistic missiles and space exploration. In the 1940s, the Air Force hired Boeing to help develop the Navaho guided missile system. The Air Force and NASA also used Boeing to test liquid-propellant rocket engines, many of which were used in the space program. But over 500,000 gallons of the solvent used to clean rocket engines and launch sites, trichloroethylene, contaminated the soil, along with heavy metals and other toxins. A trichloroethylene containment system was implemented in 1961, after which Boeing did its private commercial testing, but the damage was already done. California concedes that it cannot identify any chemical contamination that resulted from non-federal activity and that, to the extent that there is any contamination from Boeing's private activity, it cannot be distinguished from federal contamination.

All this nuclear and rocket research is over now. DOE ended its nuclear research at Santa Susana in the 1980s. In

1996, DOE decided to close its research center and removed many of the facilities. The Air Force's and NASA's rocket research ended in 2006. Operations at the site now are limited to trying to clean it up. Different aspects of the cleanup are carried out under different federal and state authorities. The federal government supervised the cleanup of radioactive contamination, and the California Department of Toxic Substances Control supervised the cleanup of chemical contamination under generally applicable state law.

The subject of this litigation is a state's authority, as opposed to the federal government's authority, to regulate the cleanup of radioactive pollution. The issue is whether the state may mandate more stringent cleanup procedures, not generally applicable within the state, to a particular site where the federal government undertook to clean up nuclear contamination it created. In the circumstances of this case, the answer is no.

So far, the federal Department of Energy, as successor to the Atomic Energy Commission, has supervised and implemented the cleanup of radioactive material. Under the Atomic Energy Act, DOE is responsible for establishing a comprehensive health, safety, and environmental program for managing DOE's nuclear facilities nationwide.[1] DOE has implemented that authority by issuing orders that set health and safety limits for radioactive releases and cleanup and site-closure procedures.[2]

---

[1] 42 U.S.C. §§ 2121(a)(3), 2201.

[2] *See* DOE Orders 435.1, 458.1, 5400.1, 5400.5, *available at* https://www.directives.doe.gov/directives. DOE Order 435.1, *Radioactive Waste Management*, and its accompanying manuals set forth requirements

To clean up the radioactive contamination, DOE hired Boeing. Boeing conducted a study of the contamination at Santa Susana. The soil, bedrock, and groundwater contamination has been extensively sampled and analyzed. Different parts of the site have different sorts of pollutants, since rocket testing was done in some areas, and nuclear research in others. In 2003, DOE adopted an environmental assessment for cleaning up radioactive waste in the area where nuclear research was performed. This federal plan proposed to clean it up to standards suitable for industrial, recreational, and even suburban residential use. As a cleanup contractor, Boeing is actively cleaning up the Santa Susana site on behalf of DOE. Boeing pays a portion of the cleanup costs and will bear the portion of costs not paid by or recovered from the federal government. The federal government sets the standard for the entire cleanup of radioactive materials (the only waste at issue in this case) and directs Boeing's conduct.

Not everyone was satisfied with the DOE plan. The federal Environmental Protection Agency ("EPA"), the State of California, and various advocacy groups have challenged both the plan and DOE's decision to prepare an environmental assessment as opposed to an environmental impact statement. The question whether an environmental impact statement should be prepared is not before us in this litigation. A federal district court injunction in another case prohibits DOE from transferring ownership, possession, or

---

for managing radioactive waste including characterization, treatment, disposal, and monitoring. DOE Order 5400.5, *Radiation Protection of the Public and the Environment*, addresses cleanup standards that DOE contractors are required to implement during decontamination and decommissioning activities.

control over anything in the primary area of radioactive contamination until it prepares an environmental impact statement.[3]

Non-radioactive chemical pollutants are regulated differently from radioactive pollutants.[4]   The California Department of Toxic Substances Control regulates the cleanup of chemical contamination, pursuant to an agreement with EPA authorizing state control, under a different federal statute from the one applicable to radioactive materials.[5]   The various state and federal agencies involved, and Boeing, agreed upon an order from California's Department of Toxic Substances Control to clean up the chemical contamination to a level adequate for suburban residential use.  That order does not address the cleanup of radioactive materials.

This case arises from the State of California's decision to extend its control to cleanup of radioactive pollutants.  In October 2007, California passed Senate Bill 990, "Cleanup of Santa Susana Field Laboratory," prescribing cleanup standards for both radioactive and chemical contamination.[6] The statutory standard requires that the site be made suitable for "suburban residential or rural residential (agricultural)

---

[3] *Natural Res. Def. Council, Inc. v. Dep't of Energy*, No. C-04-04448 SC, 2007 WL 1302498, at *22 (N.D. Cal. May 2, 2007).

[4] *United States v. Manning*, 527 F.3d 828, 833 (9th Cir. 2008).

[5] California operates a federally approved hazardous waste management plan pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. § 6926.  This plan covers only chemical contamination, not radioactive materials.  42 U.S.C. §§ 6903(5), (27), 6905(a).

[6] S.B. 990, 2007 Reg. Sess., ch. 729 (Cal. 2007).

[use], whichever produces the lower permissible residual concentration" for each contaminant found at the site.[7]  The state statute does not further define the "rural residential (agricultural)" standard, but the federal EPA "agricultural" standard apparently intended by the state statute assumes "consumption of farm products for a subsistence farmer," getting all his or her vegetables, fruit, meat, fish, and milk from the land, along with incidental consumption of soil and inhalation of dust.[8]  In effect, Senate Bill 990 ("SB 900") would require that hypothetical subsistence farmers could live safely on their farms eating nothing but their chickens, eggs, crops, and cheese and drinking their milk from their cows eating the grass, in this patch of nuclear and chemical toxic waste in the Los Angeles suburbs.

Boeing and the federal agencies contend that this standard is more demanding than the usual practice under state and federal law of setting a cleanup level commensurate with a site's reasonably foreseeable use.[9]  It may well be

---

[7] Cal. Health & Safety Code § 25359.20(c).

[8] EPA, *Preliminary Remediation Goals for Radionuclides: Agricultural Biota, Soil and Water Graphic and Supporting Text*, *available at* http://epa-prgs.ornl.gov/radionuclides/agsoilimage.html.

[9] *See* Cal. Health & Safety Code § 25356.1.5(d) ("The exposure assessment of any risk assessment . . . shall include the development of reasonable maximum estimates of exposure for both current land use conditions and reasonably foreseeable future land use conditions at the site."); EPA, OSWER Directive No. 9355.7-19, *Considering Reasonably Anticipated Future Land Use and Reducing Barriers to Reuse at EPA-lead Superfund Remedial Sites* (2010); EPA, OSWER Directive No. 9355.7-04, *Land Use in the CERCLA Remedy Selection Process* (1995); EPA, Publ'n No. 9285.7-01B, *Risk Assessment Guidance for Superfund (RAGS) Part B*, ch. 2.3 (1991).

unreasonable to foresee subsistence farming at the site. The record does not show why this standard was adopted, or whether subsistence farming of this sort was contemplated for the Los Angeles suburbs. The subsistence farming standard is more stringent than the suburban residential standard required by the agreed-upon order governing the cleanup of non-radioactive chemicals. DOE's cleanup procedures specifically rejected the state law's standard as "not a reasonable scenario for the site." Boeing has made a public commitment to dedicate the site for public use as open space parkland, not subsistence farming. But reasonable foreseeability of subsistence farming is not the controlling issue in this case. The relevant tension in this case is the state's authority to impose its subsistence farming standard as against the less stringent federal industrial, recreational, and residential standard.

Until SB 990's cleanup standard is met, the state law makes it a crime for "[any] person or entity [to] sell, lease, sublease, or otherwise transfer" the land.[10] The "Statement of Uncontroverted Facts," not disputed by the California Department of Toxic Substances Control, says that remediating the groundwater to the California standard "could take as long as 50,000 years."

Boeing filed this lawsuit in federal district court challenging the validity of the California statute, SB 990, controlling cleanup of the Santa Susana Laboratory grounds. Boeing argued, and the district court agreed, that the federal government had preempted the field of regulation of nuclear safety, and alternatively that cleanup of radioactive materials at the Santa Susanna site is a federal activity, so state

---

[10] Cal. Health & Safety Code §§ 25359.20(d); 25190.

regulation of how the federal government cleans it up violates the Supremacy Clause and the doctrine of intergovernmental immunity.

The California Department of Toxic Substances Control ("California") appeals. We vacated oral argument to give the government an opportunity to file an amicus brief, which it did. The federal government agrees with the district court that the state law, SB 990, is unconstitutional under the Supremacy Clause and alternatively, because Congress has preempted the field.

## ANALYSIS

The case was decided on summary judgment, so we review de novo.[11]

### I.  Standing

California does not challenge Boeing's standing, but some advocacy groups as amici curiae do. Their argument is that Boeing suffers no injury in fact from SB 990 because as a federal contractor, it will be paid for its work and bears no other costs. We disagree. The law prohibits Boeing from transferring its own real property, injury enough.[12] Even if the federal government does pay for all the cleanup work, the estimated 50,000 year delay in transferability (based on estimated time for cleanup of groundwater to be completed)

---

[11] *United States v. Manning*, 527 F.3d 828, 836 (9th Cir. 2008).

[12] *Andrus v. Allard*, 444 U.S. 51, 64 n.21 (1979) ("Because the regulation they challenge restricts their ability to dispose of their property, appellees have a personal, concrete, live interest in the controversy.").

is indeed an injury in fact to Boeing as landowner.  Nor has the federal government agreed to cleanup the entire site at its own expense to SB 990's standards.  California concedes that Boeing will pay the portion of the cleanup expenses not borne by the federal government.  Injury in fact is clear.

## II.  Intergovernmental Immunity

Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state."[13] Accordingly, state laws are invalid if they "regulate[] the United States directly or discriminate[] against the Federal Government or those with whom it deals."[14]  SB 990 is invalid on both grounds.

## A.  Direct Regulation of the U.S. Government

SB 990 regulates the Department of Energy's cleanup activities directly.   SB 990 authorizes California's Department of Toxic Substances Control to "use any legal remedies available" under the State's hazardous waste laws "to compel a responsible party or parties to take or pay for appropriate removal or remedial action necessary to protect the public health and safety and the environment at the Santa Susana Field Laboratory site."[15]  DOE is a "responsible party" with respect to radioactive contamination.  All of the contamination at Santa Susana is the result of federal activity

---

[13] *Mayo v. United States*, 319 U.S. 441, 445 (1943).

[14] *North Dakota v. United States*, 495 U.S. 423, 435 (1990); *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010).

[15] Cal. Health & Safety Code § 25359.20(a).

or is indistinguishable from contamination caused by federal activity. In addition, SB 990's legislative findings state that the Act is necessary in large part because of federal activity at the site and because "DOE declined to follow the 1995 Joint Policy [between EPA and DOE] and chose to instead rely on less protective cleanup standards."[16]

The federal Department of Energy has accepted responsibility for the cleanup of radioactive contamination, and it is actively conducting the cleanup through its cleanup contractor, Boeing. SB 990 affects nearly all of DOE's decisions with respect to the cleanup, including the environmental sampling that is required, the cleanup procedures to be used, and the money and time that will be spent. The state law requires an application of more stringent cleanup standards than federal laws and DOE's cleanup procedures do. Whether state law is better or worse does not affect state authority, just whether the state regulates federal activity.

The federal government's decision to hire Boeing to perform its cleanup work does not affect the legal analysis. In *Goodyear Atomic Corp. v. Miller*, the Supreme Court held that "a federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation."[17] In *Gartrell Construction Inc. v. Aubry*, we held that California's licensing requirements for construction contractors were preempted to the extent that they applied to federal

---

[16] SB 990 § 2(h).

[17] 486 U.S. 174, 181 (1988).

contractors.[18]  California argues that Boeing must "stand in the government's shoes" in order to assert immunity from state regulation.  The cases that California cites to are inapposite as they discuss generally applicable state tax laws, which resulted in merely an increased economic burden on federal contractors as well as others.  These tax laws did not regulate what the federal contractors had to do or how they did it pursuant to their contracts.

SB 990 directly interferes with the functions of the federal government.  It mandates the ways in which Boeing renders services that the federal government hired Boeing to perform.  The state law replaces the federal cleanup standards that Boeing has to meet to discharge its contractual obligations to DOE with the standards chosen by the state.  It overrides federal decisions as to necessary decontamination measures.  Unlike the tax cases, SB 990 regulates not only the federal contractor but the effective terms of federal contract itself.

Thus, SB 990 violates intergovernmental immunity unless Congress has clearly and unambiguously authorized California to exercise authority over the Department of Energy with respect to radioactive materials.  "It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation."[19]

---

[18] 940 F.2d 437, 441 (9th Cir. 1991).

[19] *Goodyear Atomic Corp.*, 486 U.S. at 180 (quoting *EPA v. State Water Res. Control Bd.*, 426 U.S. 200, 211 (1976)).

There is no clear congressional authorization in the Atomic Energy Act that would allow California to regulate DOE's cleanup of radioactive materials at Santa Susana. The agreement entered between California and the Atomic Energy Commission in 1962 does not affect the immunity analysis. The 1962 agreement was made pursuant to the 1959 amendment to the Atomic Energy Act that allowed the Atomic Energy Commission to transfer licensing authority over nuclear materials to states, pursuant to individual agreements with individual states.[20] Congress sought, among other things, "to recognize the need, and establish programs for, cooperation between the States and the Commission with respect to control of radiation hazards associated with the use of [nuclear material]."[21] The Act provides that states "shall have authority to regulate the materials covered by [an] agreement for the protection of the public health and safety from radiation hazards."[22]   Under the 1962 agreement, California's Department of Public Health has licensed Boeing's *commercial* nuclear work at Santa Susana.

The 1962 agreement does not grant California any authority to regulate the federal government. The Atomic Energy Commission's regulations implementing the 1959 amendment explicitly state that exemptions from federal licensing authority under the agreement between states and the Commission "do not apply to agencies of the Federal

---

[20] 42 U.S.C. § 2021.

[21] 42 U.S.C. § 2021(a)(2).

[22] 42 U.S.C. § 2021(b).

government."[23]  So even within "Agreement States," such as California, the federal agencies remain subject to the federal government's exclusive regulatory authority.  The 1962 agreement references these regulations, and no language under the agreement indicates that the AEC was ceding authority to regulate federal activities to state agencies. Subsequent administrative developments make this clear.[24]

Our conclusion is consistent with the history of the Atomic Energy Act and Congress's response to other attempts by states to regulate federal activities.  Section 2018 of the Atomic Energy Act provides that nothing in the Act affects state regulatory authority over the "generation, sale, or transmission of electric power produced through the use of nuclear facilities licensed by the Commission."[25]  In 1965, Congress added the following to Section 2018: "*Provided*, That this section shall not be deemed to confer upon any

---

[23] 27 Fed. Reg. 1350, 1352 (1962) (codified at 10 C.F.R. § 150.10).

[24] The Atomic Energy Commission was abolished in 1974, and its duties divided between the Nuclear Regulatory Commission ("NRC") and the Energy Research Development Administration, subsequently turned into the cabinet-level Department of Energy.  The Nuclear Regulatory Commission, now with the authority to enter into agreements with states, makes it clear that the agreement with states "does not transfer regulatory authority to the States over . . . [a]ctivities of Federal Agencies located in Agreement States."  NRC Procedure SA-500, *Jurisdiction Determinations* 2 (Sept. 25, 2007).  NRC also requires the Agreement States to provide exemptions for NRC's and DOE's prime contractors performing work on government-owned or controlled sites from licensing requirements. Statement of Policy, 46 Fed. Reg. 7543 (Jan. 23, 1981).  *Cf.* 10 C.F.R. §§ 30.12, 40.11, 70.11 (exempting NRC's and DOE's prime contractors from licensing requirements under the Atomic Energy Act).

[25] 42 U.S.C. § 2018.

Federal, State, or local agency any authority to regulate, control, or restrict any activities of the Commission."[26] Congress added this proviso to overrule a Ninth Circuit opinion, *Maun v. United States*, 347 F.2d 970 (9th Cir. 1965), which interpreted the section to allow a municipality to prohibit transmission lines that the Atomic Energy Commission sought to build in order to carry out its own activities.[27]

The Resource Conservation and Recovery Act ("RCRA")[28] does not authorize California to regulate DOE's cleanup of radioactive contamination. RCRA allows states to operate a hazardous waste management plan applicable to federal facilities so long as the state regulates "in the same manner, and to the same extent, as any person is subject to such requirements."[29] But RCRA excludes from its coverage radioactive materials regulated under the Atomic Energy Act.[30] So RCRA does not apply to the radioactive contamination in this case.

Nor does the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")[31] save SB

---

[26] Pub. L. No. 89-135, 79 Stat. 551.

[27] *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 210–11 (1983).

[28] 42 U.S.C. § 6901, *et seq*.

[29] 42 U.S.C. §§ 6926, 6961(a).

[30] 42 U.S.C. §§ 6903(5), (27), 6905(a).

[31] 42 U.S.C. § 9601, *et seq*.

990.  Under CERCLA, states may obtain authority to clean up certain hazardous waste sites by obtaining EPA approval and entering into a "cooperative agreement."[32]  Unlike RCRA, some provisions of CERCLA cover nuclear materials.  The definition of "release" includes releases of nuclear materials except in certain situations.[33]  EPA includes "radionuclides" in the list of "hazardous substances."[34]  And CERCLA contains a federal immunity waiver clause with respect to state laws concerning removal and remedial of hazardous substances.  However, the waiver does not apply "to the extent a State law would apply any standard or requirement to [federal] facilities which is more stringent than the standards and requirements applicable to facilities which are not owned or operated by [the federal government]."[35]  SB 990 applies more stringent requirements to Santa Susana than to non-federal facilities because it requires cleanup to a standard suitable for subsistence farming, rather than for the site's reasonably foreseeable future use.  Under the state's generally applicable process, the future use would be determined by considering a number of site-specific factors such as current use, county general plans, and topography.  It is undisputed that the subsistence farming has not been so determined as a land use assumption for the Santa Susana site.

---

[32] 42 U.S.C. § 9604(d)(1)(A).

[33] 42 U.S.C. § 9601(22)(C).

[34] 40 C.F.R. Part 302, Table 302.4.  Under CERCLA, EPA has the authority to designate additional hazardous substances by regulations. 42 U.S.C. § 9602.

[35] 42 U.S.C. § 9620(a)(4).

Therefore, we conclude that SB 990 regulates the federal government directly in violation of the Supremacy Clause.

## B.  Discrimination Against the U.S. Government and Its Contractors

SB 990 also violates intergovernmental immunity because it discriminates against the federal government and Boeing as a federal contractor. "A state or local law discriminates against the federal government if it treats someone else better than it treats the government."[36] California does not dispute that "SB 990 singles out Boeing, DOE, NASA and the [Santa Susana Field Laboratory] site for a substantially more stringent cleanup scheme than that which applies elsewhere in the State." The fact that Santa Susana is especially contaminated does not render the law non-discriminatory because California's generally-applicable environmental laws do not impose the SB 990 radioactive cleanup standards at the Santa Susana site.

The federal government's decision to hire Boeing to perform the cleanup rather than using federal employees does not affect our immunity analysis on this ground. When the state law is discriminatory, a private entity with which the federal government deals can assert immunity.[37] In *Davis v. Michigan Department of Treasury*, a retired federal employee challenged Michigan's taxation of his federal retirement

---

[36] *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (internal quotation marks omitted).

[37] *North Dakota v. United States*, 495 U.S. 423, 435 (1990).

benefits.[38] Michigan argued that only the federal government, not private entities or individuals, are immune from state laws.[39] The Supreme Court disagreed because the state law at issue discriminated against federal employees by exempting from state taxation retirement benefits paid to state employees, but not those paid to federal employees.[40] The Supreme Court held that

> It is true that intergovernmental tax immunity is based on the need to protect each sovereign's governmental operations from undue interference by the other. But it does not follow that private entities or individuals who are subjected to discriminatory taxation on account of their dealings with a sovereign cannot themselves receive the protection of the constitutional doctrine. Indeed, all precedent is to the contrary.[41]

Likewise, Boeing cannot be subjected to discriminatory regulations because it contracted with the federal government for the nuclear research and now the cleanup of radioactive contamination.

SB 990 specifically targets Santa Susana because of the radioactive pollution created by federal activity on the site

---

[38] 489 U.S. 803, 814 (1989).

[39] *Id.*

[40] *Id.* at 814–15.

[41] *Id.* at 814 (citations omitted).

and because "DOE declined to follow the 1995 Joint Policy [between EPA and DOE] and chose to instead rely on less protective cleanup standards."[42]  SB 990 applies more stringent cleanup standards than generally applicable state environmental laws.  By doing so, SB 990 discriminates against the federal government and against Boeing as a federal contractor.  Therefore, it is invalid under the doctrine of intergovernmental immunity.

The 2010 Administrative Orders on Consent from the California Department of Toxic Substances Control that DOE and NASA agreed to do not affect the analysis of SB 990. Both Orders set a radioactive cleanup standard for the soil in certain areas of Santa Susana.  They do not set cleanup standards for bedrock or groundwater, and SB 990 does.  Any waiver clauses included in the Orders have no effect beyond the term of the Orders.

## III.     Severability

We agree with the district court that the terms of SB 990 are unseverable.  California concedes that applying SB 990 only to chemical cleanup is impossible without gutting the Act because the Act sets cleanup standards in part by requiring that "the cumulative risk from radiological and chemical contaminants at the site shall be summed."[43]  We decline to construe SB 990 as limited to non-radioactive cleanup because it would "require us to examine and rewrite most of the statute in a vacuum as to how the various

---

[42] SB 990 § 2(h).

[43] Cal. Health & Safety Code § 25359.20(c).

provisions were intended to intersect and in a way that would be at odds with the purpose of the statute."[44]

The judgment of the district court is **AFFIRMED**.

---

[44] *United States v. Manning*, 527 F.3d 828, 840 (9th Cir. 2008).