**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

STATE OF WASHINGTON; JAY
ROBERT INSLEE, in his official
capacity as Governor of the State of
Washington; JOEL SACKS, in his
official capacity as Director of the
Washington State Department of
Labor and Industries; WASHINGTON
STATE DEPARTMENT OF LABOR &
INDUSTRIES,
*Defendants-Appellees.*

No. 19-35673

D.C. No.
4:18-cv-05189-
SAB

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Stanley Allen Bastian, District Judge, Presiding

Argued and Submitted July 6, 2020
Seattle, Washington

Filed August 19, 2020
Amended April 15, 2021

Before:  RICHARD R. CLIFTON and MILAN D. SMITH,
JR., Circuit Judges, and JAMES DONATO,[*]
District Judge.

Order;
Concurrence in Order by Judge Milan D. Smith, Jr.;
Dissent from Order by Judge Collins;
Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[**]

### Governmental Immunity

The panel filed an order amending its opinion, denying a petition for panel rehearing, and denying on behalf of the court a petition for rehearing en banc; and an amended opinion affirming the district court's summary judgment in favor of the State of Washington, upholding HB 1723, which amended Washington's workers' compensation scheme and established for workers at the Hanford site – a decommissioned federal nuclear production site – a presumption that certain conditions and cancers are occupational diseases that is rebuttable only by clear and convincing evidence.

The United States claimed that HB 1723 impermissibly directly regulated and discriminated against the Federal

---

[*] The Honorable James Donato, United States District Judge for the Northern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Government and those with whom it dealt in violation of the doctrine of intergovernmental immunity.

The panel held that HB 1723 fell within the waiver of 40 U.S.C. § 3172, which authorizes states to apply their workers' compensation laws to federal lands and projects in the states in the same way as if the premises were under the exclusive jurisdiction of the states. The panel held, accordingly, that HB 1723 did not violate the doctrine of intergovernmental immunity.

The panel declined to resolve two other issues raised by the parties because they were not properly before the court.

Judge M. Smith concurred in the denial of rehearing en banc. He wrote that the dissent from rehearing en banc disregarded the plain text of 40 U.S.C. § 3172(a) and misread the relevant precedent, and the majority opinion did nothing more than apply the full text of the federal statute at issue and correctly applied the relevant case law.

Judge Collins, joined by Judges Callahan, Bennett, and Bress, dissented from the denial of rehearing en banc. He wrote that the State of Washington lacked any authority to impose special workers' compensation rules on federal facilities, and this court had no authority to construe a statute to mean the exact opposite of what its words said and no authority to ignore a directly controlling Supreme Court decision, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988).

## COUNSEL

John S. Koppel (argued) and Mark B. Stern, Appellate Staff; Bill Hyslop, United States Attorney; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Plaintiff-Appellant.

Noah G. Purcell (argued), Solitor General; Anastasia Sandstrom, Senior Counsel; Paul Wiedeman, Assistant Attorney General; Robert W. Ferguson, Attorney General; Office of the Attorney General, Olympia, Washington; for Defendants-Appellees.

## ORDER

The court's opinion filed August 19, 2020, and published at 971 F.3d 856 (9th Cir. 2020), is hereby amended as follows: on page 19 of the slip opinion, replace "Critically, as it did in the district court, the United States conceded during oral argument that Washington could enforce HB 1723 if the Federal Government were not involved and the Hanford site were a state project." with "Critically, as it did in the district court, the United States conceded during oral argument that Washington could enforce a version of HB 1723 that did not involve the Federal Government and where the Hanford site were a state project." An amended opinion is filed concurrently with this order.

With this amendment, the panel has unanimously voted to deny the petition for panel rehearing. (Dkt. 37) Judge M. Smith votes to deny the petition for rehearing en banc, and Judge Clifton and Judge Donato so recommend. (*Id.*)

The full court has been advised of the petition for rehearing en banc (*Id.*)  A judge requested a vote on whether to rehear the matter en banc.  The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc reconsideration.  Fed. R. App. P. 35(f).

The petition for rehearing en banc is **DENIED**.  No subsequent petitions for panel rehearing or rehearing en banc shall be permitted.  Judge M. Smith's concurrence with and Judge Collins's dissent from the denial of rehearing en banc are filed concurrently herewith.

---

M. SMITH, Circuit Judge, concurring in the denial of rehearing en banc:

Despite the overwhelming rejection by our court of his en banc call in this case, my dissenting colleague continues to speak of this rather straight-forward statutory construction case in apocalyptic terms. Because of his extensive use of hyperbole, coupled with the fact that his claims were not asserted or addressed in our opinion, I briefly respond to my colleague's contentions in this concurrence so they will be appropriately challenged.  Briefly stated, Judge Collins disregards the plain text of § 3172(a) and misreads the relevant precedents.  In contrast, our decision does nothing more than apply the *full* text of the federal statute at issue and correctly apply the relevant case law.  For that reason, I concur in the court's denial of rehearing en banc.

# I

As Judge Collins notes, "whether the Washington statute is valid turns solely on whether it is authorized by § 3172(a)."  Dissent at 23.  "Statutory interpretation, as we

always say, begins with the text." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *see also Medina Tovar v. Zuchowski*, 982 F.3d 631, 640 (9th Cir. 2020) (Collins, J., concurring in the judgment) ("As with any question of statutory interpretation, we must 'begin with the text of the statute.'" (quoting *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011)). Curiously, Judge Collins does not begin with the *complete* text of § 3172(a).

Subsection 3172(a) provides:

> The state authority charged with enforcing and requiring compliance with the state workers' compensation laws and with the orders, decisions, and awards of the authority may apply the laws to all land and premises in the State which the Federal Government owns or holds by deed or act of cession, and to all projects, buildings, constructions, improvements, and property in the State and belonging to the Government, *in the same way and to the same extent as if the premises were under the exclusive jurisdiction of the State* in which the land, premises, projects, buildings, constructions, improvements, or property are located.

40 U.S.C. § 3172(a) (emphasis added). The phrase at issue in this case is: "in the same way and to the same extent as if the premises were under the exclusive jurisdiction of the State." *Id.*

Judge Collins focuses only on the first part of the italicized text: "in the same way and to the same extent." According to my dissenting colleague, "Washington has fashioned specially tailored rules that apply to the federal

Hanford facility in a *different* way, and that impose liability to a *different* extent, than Washington does with any premises 'under the exclusive jurisdiction of the State.'" Dissent at 24.

This reading ignores the latter part of the italicized text: "as if the premises were under the exclusive jurisdiction of the State." Subsection 3172(a) does not require that state governments enact the exact same workers' compensation scheme for state-owned and federally-owned property. Instead, a state may enact a workers' compensation scheme for federally-owned property as long as it *could* enact the same scheme "in the same way and to the same extent" if the property were under the jurisdiction of the state.

As we note in the amended opinion, "the United States conceded during oral argument that Washington could enforce a version of HB 1723 that did not involve the Federal Government and where the Hanford site were a state project." Amended Slip Op. at 53. If the Hanford site were under the control of the state government, Washington could apply this workers' compensation scheme to employees and contractors from that hypothetical site.[1] Subsection 3172(a) "removes federal jurisdiction as a barrier to a state's authority over workers' compensation laws for all who are located in the state." *Washington*, 971 F.3d at 865. If Washington could apply a version of HB 1723 to a

---

[1] A state workers' compensation scheme is, of course, "[s]ubject to [other] constitutional constraints," such as the due process and equal protection clauses, but "the States possess broad authority to enact laws that are reasonably deemed to be necessary to promote the health, safety, and general welfare of those in its jurisdiction, including workers' compensation laws." *Washington*, 971 F.3d at 865 (citing *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 172 (1972)). However, only the intergovernmental immunity doctrine is at issue in this case.

hypothetical state-owned Hanford site, it can do so for a federally-owned Hanford site. This shows that Washington is applying HB 1723 "as if [the Hanford site] were under the exclusive jurisdiction of the State." 40 U.S.C. § 3172(a).

If the United States can show that a state applied a workers' compensation scheme to federally-owned property but could not apply that same scheme to similarly-situated state-owned property "in the same way and to the same extent," such a scheme would not be protected by § 3172(a). For example, imagine that both Washington and the Federal Government operate public parks within the physical boundaries of the state. For reasons unknown (perhaps because of climate change, perhaps because of an increase in the number of picnic baskets in the parks), bear attacks dramatically rise in both federal and state parks. Washington recognizes that these increased bear attacks are a problem for park rangers in both types of parks and enacts the following amendment to its workers' compensation scheme: "Each time a park ranger in a state park is injured by a bear, that ranger shall receive compensation of $100. Each time a park ranger in a federal park is injured by a bear, that ranger shall receive compensation of $1,000,000." However, the Washington Constitution also contains a provision stating that "workers' compensation payments to state employees may not exceed $100,000."

That new statutory provision would violate the intergovernmental immunity doctrine and would not be protected by § 3172(a) because, in this scenario: (1) the Federal Government can show that Washington is applying a worker's compensation scheme in a different manner and to a different extent against federal employees; *and* (2) Washington *could not* apply the $1,000,000 payment scheme to state park rangers because the Washington

Constitution forbids it.  Thus, the $1,000,000 payment provision could not be applied "in the way and to the same extent as if the premises were under the exclusive jurisdiction of" Washington.  Contrary to my dissenting colleague's assertion, our reading of the statute does not "ignore[]" the words "in the same way and to the same extent" and "effectively read[ that phrase] out of the statute." Dissent at 32.  Our reading of the statute gives meaning to "every word Congress used."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979).

Judge Collins's reading of the statute violates the basic canon of statutory construction that we must "construe what Congress has written.  After all, Congress expresses its purpose by words.  It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort."  *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951).  My dissenting colleague argues that the phrase "as if the premises were under the exclusive jurisdiction of the State" instead "provides the baseline for comparison in *applying* the statute's non-discrimination principle."  Dissent at 33 (emphasis in original).

Judge Collins puts the cart before the horse. He discusses § 3172(a)'s alleged "non-discrimination" or "anti-discrimination" principle numerous times in his dissent. *See* Dissent at 28, 30, 30–31, 31–32, 33, 34, 36.  However, neither *Goodyear* nor *Lewis County* stand for the proposition that § 3172(a) requires that a state pass identical workers' compensation schemes for federal and non-federal facilities. I agree that a state cannot apply a scheme to the federal facility that it could not apply to a non-federal facility.  In that sense, it could be said that § 3172(a) contains a "non-discrimination principle."  To Judge Collins, however,

*Goodyear* and *Lewis County* forbid a state from passing different workers' compensation schemes for different types of facilities, even if those schemes could be applied to non-federal facility, in line with the plain text of the statute.

Perhaps Judge Collins is hoping that by repeating the phrase "non-discrimination principle" over and over that his interpretation of the statute will become true. But alas, that is not the case. The only way my dissenting colleague can give meaning to the phrase "as if the premises were under the exclusive jurisdiction of the State" is by first by reading his extra-textual version of the "non-discrimination principle" into the statute, and then by attempting to show that the phrase is about applying this concocted principle. Judge Collins's interpretation is "an unreasonably narrow and atextual reading of the statutory exception." *Szonyi v. Barr*, 942 F.3d 874, 887 (9th Cir. 2019) (Collins, J., dissenting from denial of rehearing en banc), *cert. denied*, 141 S. Ct. 444 (2020).

We read the phrase simply according to its plain language: if a state can apply a workers' compensation law to premises under its own exclusive jurisdiction, then it can apply that same law to premises under federal jurisdiction. Neither my dissenting colleague nor the United States question that Washington could apply the protections in HB 1723 to a facility owned by the State of Washington. In fact, as highlighted above, the United States conceded at oral argument that Washington could apply a version of HB 1723 to a state-owned Hanford-like facility.[2] Thus, it is only our

---

[2] My dissenting colleague further argues that our "reliance on hypothetical laws is also refuted by the statutory text, which says that the state agency charged with enforcing '*the* state workers' compensation laws' may apply '*the* laws' to federal property as specified." Dissent

reading that gives content to each and every word of § 3172(a), and it is only our reading that conforms to the statute's plain text.[3]

## II

My dissenting colleague opines that we erred in applying *Goodyear* and *Lewis County*. Respectfully, we did not.

## A

In *Goodyear*, the Supreme Court handed down a broad holding:

---

at 34 (quoting 40 U.S.C. § 3172(a)). This argument fails. Washington is applying HB 1723, which is an amendment to the Washington Industrial Insurance Act, the state's workers' compensation scheme. *See Washington*, 971 F.3d at 859–60. To the extent Judge Collins contends that we cannot compare HB 1723 to a hypothetical state law that would violate § 3172(a), Congress's decision to use the phrase "as if" clearly refutes that premise. "As if" commands us to imagine that the Hanford site were under Washington's exclusive jurisdiction and to determine whether Washington could extend the protections of HB 1723 to that hypothetical site.

[3] Judge Collins only briefly attempts to refute the comparison between § 3172(a) and other statutes in which Congress has waived intergovernmental immunity, namely 42 U.S.C. §9620(a)(4) and 4 U.S.C. § 111. *See Washington*, 971 F.3d at 864 & n.7; Dissent at 35–36. As the Supreme Court has instructed, we bolstered our interpretation of § 3172(a) by comparing it to other statutes waiving intergovernmental immunity. *See Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691, 694–97 (2003). From both 42 U.S.C. §9620(a)(4) and 4 U.S.C. § 111, it is clear that "[w]hen Congress has wished to" codify a nondiscrimination rule in a waiver of intergovernmental immunity, "it has shown itself capable of doing so in unmistakable terms." Breuer, 538 U.S. at 697 (citation and internal quotation marks omitted). Congress did not use similar language in § 3172(a).

Section 290 provides that a state authority charged with enforcing "workmen's compensation laws," which in Ohio is the Industrial Commission, "shall have the power and authority to apply such laws" to federal premises "in the same way and to the same extent as if said premises were under the exclusive jurisdiction of the State." *This language places no express limitation on the type of workers' compensation scheme that is authorized.*

486 U.S. at 183 (emphasis added) (footnote omitted).

To Judge Collins, "the Government's argument [in *Goodyear*] was that Congress had imposed an *additional* limitation on the application of state workers' compensation laws, beyond the requirement that they be applied in a non-discriminatory fashion." Dissent at 26. But where, one might ask, did the Supreme Court interpret § 290, the predecessor to § 3172(a), to require the non-discrimination principle proposed by Judge Collins?

My dissenting colleague is correct that pursuant to the Ohio scheme at issue in *Goodyear*, the Federal Government and private employers were subject to the same scheme. *See* Dissent at 26. The Court highlighted this fact. *See Goodyear*, 486 U.S. at 183–85. The Court did not encounter a scenario like the one with HB 1723 because the Ohio statute was generally applicable. Thus, it would make sense for the Court to note that the state statute at issue was applicable to private and federal employers alike.

Because the Ohio statute in *Goodyear* was dissimilar to HB 1723, the Court's notation of the general applicability of

the statute is not controlling in this case.**4** Judge Collins writes that "[t]here is not much ambiguity about [the *Goodyear*] holding." Dissent at 25. But the Court's notation that the Ohio statute was generally applicable was not part of the holding in *Goodyear*, as even Judge Collins acknowledges. *See* Dissent at 26 (noting that the issue in *Goodyear* was not whether the statute was generally applicable, but instead whether § 290 limited the type of workers' compensation laws). The Court never explicitly disavowed a scheme that applied only to a federal facility "as if the premises were under the exclusive jurisdiction of the State," and where that scheme could be applied "in the same way and to the same extent." 40 U.S.C. § 3172(a). In other words, per the Supreme Court's interpretation, the statute does not *require* that the state law be generally applicable. The Court did not hold that the statute contains Judge Collins's alleged non-discrimination principle.**5**

---

**4** We acknowledged the differences between Goodyear and the instant case in the opinion. *See Washington*, 971 F.3d at 863 ("To be sure, the Court considered there a state workers' compensation law that did not concern a particular employer, or a particular site located in the state, like HB 1723 does.").

**5** Judge Collins nonetheless alleges that the Supreme Court did require a non-discrimination principle by writing, "On its face, § 290 compels the same workers' compensation award for an employee injured at a federally owned facility as the employee would receive if working for a wholly private facility." *Goodyear*, 486 U.S. at 183–84; *see* Dissent at 28. I have no qualms with the idea that a state must apply a workers' compensation scheme "in the same way and to the same extent" to workers at a private facility, but that state must do so only in comparison such a private facility "as if th[ose] premises were under the exclusive jurisdiction of the State." 40 U.S.C. § 3172(a). As I note above, as long as a state could apply the same workers' compensation scheme to a facility under its exclusive jurisdiction, that scheme is authorized by

What is applicable from *Goodyear*, however, is the Court's broad language interpreting the predecessor to § 3172(a).  The Court wrote that the federal waiver of intergovernmental immunity "places *no express limitation* on the type of workers' compensation scheme that is authorized."  *Goodyear*, 486 U.S. at 183 (emphasis added). This broad pronouncement immediately followed the Court quoting the "in the same way and to the same extent as if said premises were under the exclusive jurisdiction of the State" language.  *See id.*  HB 1723 is a "*type* of workers' compensation scheme."  *Id.* (emphasis added); *see Type*, Merriam-Webster.com Dictionary ("a particular kind, class, or group").  HB 1723 is "a particular kind, class, or group" of workers' compensation scheme, in that it particularly applies to the class of workers at the Hanford site.  As we stated in the opinion:

> [T]he Court did not purport to impose the limitation on the statute  . . . ; indeed, the Court recognized that the statute placed no express limitation on permissible workers' compensation laws.  We cannot properly construe § 3172 in a way that would conflict

---

§ 3172(a) if applied to a federal facility.  In such an instance, a worker at a federal facility "*would* receive" the same compensation award at "a wholly private facility" if the state decided to apply that particular scheme to private facilities. *Goodyear*, 486 U.S. at 18 (emphasis added). My dissenting colleague's arguments to the contrary are incorrect. *See* Dissent at 34–35 & n.3.  In the case of HB 1723, Washington did not extend those particular protections to private facilities, but as the Federal Government conceded, and as I noted above, there is little doubt that Washington had the power to enact a version of HB 1723 for a facility under its exclusive jurisdiction.

with that understanding of a materially identical statutory provision.

*Washington*, 971 F.3d at 863. Thus, while *Goodyear* did not involve the exact scenario presented here, the Supreme Court's broad interpretation of § 3172(a)'s predecessor is binding on our court.

**B**

Judge Collins also mischaracterizes *Lewis County*. As it was in *Goodyear*, the state provision at issue in *Lewis County* was applied to the Federal Government and private parties. We stated, "It is also worth noting that the County's tax on [federally]-owned farmland is also imposed on privately-owned farmland in general." *Lewis Cnty.*, 175 F.3d at 676. Thus, "Lewis County taxed private farmland to the same extent, and in the same manner, as it taxed [federal] farmland." *Id.*

As Judge Collins acknowledges, the Federal Government "argued that Washington engaged in impermissible discrimination against the Federal Government by exempting state and local government property from the property tax." Dissent at 29; *see also Lewis Cnty.*, 175 F.3d at 675 (noting that the Federal Government argued that "because Lewis County may not tax . . . any . . . state or local government property, the County may not tax property held by the" Federal Government).

By ruling in favor of Washington in *Lewis County*, we explicitly *rejected* that the statute in question, 7 U.S.C. § 1984, contained a non-discrimination principle when comparing state and federal property. In fact, we noted that "Washington's tax scheme *undeniably discriminates* between farmland that is held by the [Federal Government]

and farmland that is similarly held by the state" because "[s]tate and local governments have traditionally exempted themselves from state and local taxation." *Lewis Cnty.*, 175 F.3d at 675 (emphasis added).  This undeniable discrimination was not dispositive, showing that there was no non-discrimination principle built into the statute, at least when it came to comparing state and federal property.

To Judge Collins, *Lewis County* embedded a non-discrimination principle in § 1984 because we noted that Washington "taxed [federal] property just as it taxed other non-exempt property," *i.e.*, private property. *Id.*  However, that Washington also taxed private property was not central to our holding. *See id.* at 676 ("It is also worth noting . . . ."). Once again, Judge Collins seeks to convert dicta into binding precedent.

In *Lewis County*, we also remanded a particular claim to the district court to determine whether Lewis County "discriminated against the United States in the establishment or implementation of its rules" by classifying three individual federal parcels as non-agricultural and taxing those parcels at a higher rate than the other federal parcels, which Lewis County classified as agricultural. *Id.* at 678–79. Section IV of the *Lewis County* decision did not interpret § 1984 to require non-discrimination when comparing state and federal property.  So while Judge Collins is technically correct that *Lewis County* remanded a claim for the district court to determine if the United States faced discrimination, the discrimination in question pertained only to whether Lewis County "establish[ed] or implement[ed] . . . its [own] rules" concerning the classification of agricultural vs. non-agricultural land in a way that discriminated against the United States.  Section IV of *Lewis County* did *not* remand

the case for the purpose of applying a non-discrimination principle in comparing state and federal property.

Both *Lewis County* and this case hinged on whether the state could treat the federally-run entities differently from state-run entities.  In *Lewis County*, we interpreted the phrase "other property" not to include state-owned property, based on a congressional understanding that states had typically exempted themselves from taxation.  *See* 175 F.3d at 675–76.  In *Washington*, § 3172(a)'s language "as if the premises were under the exclusive jurisdiction of the State" qualifies the "in the same way and to the same extent" language to allow Washington to pass a particular scheme for federal employees and contractors, as long as it could apply a similar scheme to a Hanford-type facility under its own jurisdiction.

## III

While Judge Collins cites *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) to argue that the sky is figurately falling, the circumstances in this case could not be more different than those in *McCulloch*.  In refusing to allow Maryland to tax the Second Bank of the United States into oblivion, Chief Justice Marshall knew the enormous consequences at stake.  The Second Bank's continued existence would determine whether the Nation could wage war in the future, as it was the "calamit[y]" of fighting the War of 1812 without a national bank that "led the administration to propose that Congress charter" that institution.  Robert J. Reinstein, *The Limits of Congressional Power*, 89 Temp. L. Rev. 1, 67 (2016).  This case, in contrast, is about whether a single state can employ a unique workers' compensation scheme to a federal nuclear facility that has no equal.  *See Washington*, 971 F.3d at 858 (noting that "the Hanford site produced nearly two-thirds of the nation's weapons grade plutonium for use . . . during World

War II and the Cold War" and that the site's "cleanup is . . . 'unprecedented in its scale and complexity'"). A suggestion that HB 1723 will result in the elimination of the Hanford site, or will prevent the Federal Government from operating within the boundaries of the State of Washington, is "too obvious[ly]" false to be accepted. *McCulloch*, 17 U.S. at 427.

\*     \*     \*

"[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1747 (2020). The waiver of intergovernmental immunity in § 3172(a) is broad. The Supreme Court told us as much when it interpreted the provision to "place[] no express limitation on the type of workers' compensation scheme that is authorized." *Goodyear*, 486 U.S. at 183. Judge Collins might disagree with the scope of § 3172(a)'s waiver, but that was a policy decision made by Congress. If Congress wishes to restrict the waiver of intergovernmental immunity in § 3172(a) to forbid state laws like HB 1723, it obviously may do so. However, we cannot properly restrict a waiver Congress has chosen not to restrict. In this case, we applied the law as written. Nothing more. Nothing less. For that reason, I concur in the denial of rehearing en banc.

COLLINS, Circuit Judge, with whom CALLAHAN, BENNETT, and BRESS, Circuit Judges, join, dissenting from the denial of rehearing en banc:

Until the panel's opinion in this case, no federal court in the more than 200 years since Chief Justice John Marshall's landmark decision in *McCulloch v. Maryland*, 17 U.S. 316 (1819), has ever upheld a state statute that explicitly strikes at the Federal Government in the sort of extraordinary and egregious way that Washington has done here. The panel's unprecedented decision is all the more remarkable because it flouts a directly controlling decision of the U.S. Supreme Court that required the opposite result. We should have reheard this case en banc.

The panel's decision upholds a 2018 Washington statute that explicitly imposes a uniquely permissive regime of retroactive workers' compensation liability in favor of any person who worked "either directly or indirectly, *for the United States*" in connection with the "Hanford nuclear site," a decommissioned federal facility in Washington State. Wash. Rev. Code § 51.32.187(1)(b) (emphasis added). Under these special rules, any such Hanford worker who develops certain enumerated diseases is *presumed* to have a work-related "occupational disease" entitling him or her to a workers' compensation award, subject to rebuttal only by clear and convincing evidence. These facially discriminatory standards apply retroactively, even to the point of explicitly allowing previously denied claims to be *reopened* under these new, more claimant-friendly standards. These tailor-made workers'-compensation rules bear no resemblance to the normal ones that apply to employees at any other facility in Washington State.

The panel conceded that, absent "clear and unambiguous" congressional authorization for such blatant

facial discrimination against the Federal Government, Washington's law would violate the long-established doctrine of intergovernmental immunity. *United States v. Washington*, 971 F.3d 856, 861 (9th Cir. 2020); *see also Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014); *see generally McCulloch*, 17 U.S. at 436. But the panel then reached the astonishing conclusion that Congress *has* by statute affirmatively greenlighted such open and explicit discrimination against the Federal Government, thereby giving the States *carte blanche* to impose whatever special workers' compensation rules they want on the United States and its contractors. The plain language of the federal statute invoked by the panel decisively refutes this suggestion, because that statute consents to the application of the "workers' compensation laws" of a State to employees at federal facilities only "*in the same way and to the same extent*" as if the facilities were not under federal jurisdiction. *See* 40 U.S.C. § 3172(a) (emphasis added). What is more, in reading this equal-treatment language as somehow authorizing facial discrimination, the panel defied the Supreme Court's decision in *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174 (1988). Construing the very same statute invoked by the panel here, the Supreme Court held that, "*[o]n its face*," the federal statute "compels the *same* workers' compensation award for an employee injured at a federally owned facility as the employee would receive if working for a wholly private facility." *Id*. at 183–84 (emphasis added). The whole point of Washington's special statute, of course, is *not* to provide for "the same workers' compensation award for an employee" at the Hanford facility "as the employee would receive if working for a wholly private facility." *Id*. *Goodyear* thus unambiguously required this court to strike down the Washington statute.

Washington may be right in its apparent belief that, despite having "paid out more than $1.75 billion to Hanford workers," *Washington*, 971 F.3d at 866, the Federal Government has not done right by those workers who were exposed to nuclear materials at the Hanford facility.  But regardless of how noble its intentions are, Washington lacks any authority to impose special workers' compensation rules on federal facilities.  And we, in turn, have no authority to construe a statute to mean the exact opposite of what its words say and no authority to ignore a directly controlling Supreme Court decision that proves us wrong.

I respectfully dissent from our refusal to rehear this case en banc.

## I

The Hanford nuclear site that is the target of Washington's facially discriminatory law is "a decommissioned federal nuclear production site that sprawls over more than five hundred square miles in southeastern Washington State."  971 F.3d at 858.  During its active years from 1944 to 1989, the site generated large amounts of hazardous waste.  *Id*.  Since 1989, the United States Department of Energy ("DOE") has overseen cleanup efforts at the Hanford site, "primarily relying on private contractors and subcontractors to perform the actual cleanup work."  *Id*. In addition to federal contractors and employees, state agencies and private companies also participate in the efforts at and near the site.  The cleanup process is expected to last "for at least six more decades."  *Id*.

In 2018, Washington enacted HB 1723, which added § 51.32.187 as part of the Washington Industrial Insurance Act ("WIIA").  (WIIA is Washington's basic workers' compensation law.)    Section 51.32.187 retroactively

imposes a specially crafted set of more claimant-friendly liability standards *only* with respect to those persons who, at any time since 1943, "engaged in the performance of work, either directly or indirectly, for the United States" at the "Hanford nuclear site" for "at least one eight-hour shift." *See* Wash. Rev. Code § 51.32.187(1)(b).  The statute does so by creating a "prima facie presumption"—applicable only to "United States department of energy Hanford site workers"—that certain enumerated illnesses are "occupational diseases" under the WIIA.    *Id*. § 51.32.187(2)(a).    The occurrence of an "occupational disease," in turn, automatically entitles the person to "the same compensation benefits and medical, surgical and hospital care and treatment as would be paid and provided for a worker injured or killed in employment under this title."    *Id*. § 51.32.180.    The special liability-favoring presumption created by HB 1723 may be rebutted only "by clear and convincing evidence."  *Id*. § 51.32.187(2)(b).  The presumption expressly remains operative after the person's "termination of service for the *lifetime* of" that person.  *Id*. § 51.32.187(5)(a) (emphasis added).  Moreover, the statute explicitly allows workers or their surviving family members to refile, under these new standards, previously denied claims.  *Id*. § 51.32.187(5)(b).

In response to HB 1723, the United States commenced this action for declaratory and injunctive relief against Washington.  It alleged that HB 1723 "discriminates against the Federal Government and directly regulates it in violation of the doctrine of intergovernmental immunity."  971 F.3d at 860.  On cross-motions for summary judgment, the district court granted summary judgment for Washington.  *Id*.  A panel of this court affirmed, concluding that, by enacting 40 U.S.C. § 3172, Congress had provided "clear and unambiguous authorization" for the States to enact facially

discriminatory workers' compensation rules that impose uniquely burdensome liability regimes only on the Federal Government.  *Id*. at 861 (citations omitted); *see also id*. at 861–66.

## II

Two points of agreement frame the discrete issue presented by this case.  First, the panel did not dispute—and in light of the applicable precedent could not dispute—that, under the doctrine of intergovernmental immunity, "state laws are invalid if they regulate the United States directly or discriminate against the Federal Government or those with whom it deals . . . *unless* Congress provides clear and unambiguous authorization for such regulation."  971 F.3d at 861 (simplified); *see also Goodyear*, 486 U.S. at 180 ("It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation."); *Boeing Co.*, 768 F.3d at 836 (invalidating California statute that "mandate[d] more stringent cleanup procedures, not generally applicable within the state, to a particular site where the federal government undertook to clean up nuclear contamination it created").  Second, the *only* federal statute that Washington claims provides the requisite authorization is 40 U.S.C. § 3172(a).  Accordingly, whether the Washington statute is valid turns solely on whether it is authorized by § 3172(a).  Contrary to what the panel concluded in its published decision, the text of § 3172(a) and controlling precedent all confirm that the answer is "no."

## A

Section 3172(a) provides, in its entirety, as follows:

> The state authority charged with enforcing
> and requiring compliance with the state
> workers' compensation laws and with the
> orders, decisions, and awards of the authority
> may apply the laws to all land and premises
> in the State which the Federal Government
> owns or holds by deed or act of cession, and
> to all projects, buildings, constructions,
> improvements, and property in the State and
> belonging to the Government, *in the same
> way and to the same extent* as if the premises
> were under the exclusive jurisdiction of the
> State in which the land, premises, projects,
> buildings, constructions, improvements, or
> property are located.

40 U.S.C. § 3172(a) (emphasis added).   This language
provides no assistance to Washington, because that State is
manifestly *not* applying its "state workers' compensation
laws" to this particular federal facility "in the same way and
to the same extent" as if it were not a federal facility.  *See*,
*e.g.*, *Same*, Black's Law Dictionary (11th ed. 2019)
("Identical or equal; resembling in any relevant respect").
On the contrary, Washington has fashioned specially tailored
rules that apply to the federal Hanford facility in a *different*
way, and that impose liability to a *different* extent, than
Washington does with any premises "under the exclusive
jurisdiction of the State."

The correctness of this conclusion is confirmed by the
Supreme Court's controlling decision in *Goodyear*.
Construing the predecessor version of § 3172(a), which was

then known as § 290,[1] the Court observed that, "*[o]n its face*, § 290 compels the *same* workers' compensation award for an employee injured at a federally owned facility as the employee would receive if working for a wholly private facility."  486 U.S. at 183–84 (emphasis added).  There is not much ambiguity about that holding, and the panel's opinion flouts it.  Washington's facially discriminatory special liability regime for the benefit of persons who worked "either directly or indirectly[] for the United States" at the Hanford facility, *see* Wash. Rev. Code § 51.32.187(1)(b), manifestly does not provide for "the same workers' compensation award for an employee injured" at the Hanford facility "as the employee would receive if working for a wholly private facility."  486 U.S. at 183–84.

So, under the plain text of the statute, and directly controlling Supreme Court precedent, § 51.32.187 of the WIIA is *not* "clear[ly] and unambiguous[ly]" authorized by § 3172(a), and it is therefore invalid.  *Goodyear*, 486 U.S. at 180.  This case is that simple.

**B**

The panel nonetheless got this straightforward case wrong by making three serious mistakes.

---

[1] Former section 290 of Title 40 was renumbered and reworded, without material substantive change, as part of the formal enactment and codification of Title 40 in 2002.  Prior to then, Title 40 (like many other current titles of the Code) was an unenacted editorial compilation of the relevant underlying Public Laws covering the particular subject of the title.  *See* 1 U.S.C. § 204(a); 2 U.S.C. § 285b.

**1**

First, the panel disregarded *Goodyear*'s controlling construction of the statutory phrase at issue here.

In *Goodyear*, the Government contended that § 290 (now § 3172(a)) did not permit Ohio to apply, to a federal facility, "a state-law workers' compensation provision that provides an increased award for injuries resulting from an employer's violation of a state safety regulation." 486 U.S. at 176. In challenging that enhanced-award provision, the Government did *not* contend that the provision violated § 290's requirement that state law must apply to a federal facility "in the same way and to the same extent as" a private facility. Indeed, equal application of Ohio's generally applicable enhanced-award provision was precisely what the Government in *Goodyear* was trying to *avoid*. Instead, the Government's argument was that Congress had imposed an *additional* limitation on the application of state workers' compensation laws, beyond the requirement that they be applied in a non-discriminatory fashion. Specifically, the Government asserted that, in authorizing application of state "work[ers'] compensation laws" to federal facilities, Congress in § 290 only meant to authorize the sorts of provisions contained in a "*typical* workers' compensation act, under which workers are automatically entitled to certain benefits when they suffer a work-related injury, without regard to the employer's fault." *Id*. at 183 (emphasis added). Because (according to the Government) Ohio's enhanced-award provision went beyond such a typical law, that provision did not count as a "work[ers'] compensation law[]" for purposes of § 290, despite its even-handed application to federal facilities. *Id*. The Court rejected that argument, noting that the text of § 290 "places no express limitation on the *type* of workers' compensation scheme that

is authorized," and that similar types of enhanced-award provisions existed when § 290 was enacted in 1936. *Id*. at 183–84 (emphasis added). All that is required by § 290, the Court noted, is that Ohio law provide "the *same* workers' compensation award for an employee injured at a federally owned facility as the employee would receive if working for a wholly private facility," and the Ohio statute obviously met that requirement. *Id*. (emphasis added); *see also id*. at 185 ("[I]t is clear that Congress intended Ohio's law and others of its ilk . . . to apply to federal facilities 'to the same extent' that they apply to private facilities within the State.").

Seizing on *Goodyear*'s statement that § 290 (now § 3172(a)) places "no express limitation on the *type* of workers' compensation scheme that is authorized," the panel held that the *Goodyear* Court thereby allowed States to impose a *facially discriminatory* "type" of workers' compensation law. 971 F.3d at 863. That is a flagrant misreading of *Goodyear*. The Court's holding was that the statute did not impose any limitation on state workers' compensation laws *beyond* the requirement that those laws provide "the same workers' compensation award for an employee injured at a federally owned facility as the employee would receive if working for a wholly private facility." *Goodyear*, 486 U.S. at 183–84. Thus, *Goodyear* held that § 290 allows States to adopt any substantive workers' compensation system they like, *precisely* so long as it is applied in a nondiscriminatory fashion to federal facilities.[2] *Id*. at 185 (cautioning that the "meaning of

---

[2] Accordingly, the concurrence is wrong in making the strawman argument that this reading of § 3172(a) would "forbid a state from passing different workers' compensation schemes for different types of facilities." *See* Concurrence at 9–10. States may apply different standards to different types of facilities or different types of work, so

'work[ers'] compensation laws' in § 290, of course, is not infinitely elastic"). The panel's holding that § 3172(a) contains no anti-discrimination requirement at all is thus directly contrary to the Supreme Court's decision in *Goodyear*, as well as to the statutory text.

The concurrence in the denial of rehearing en banc only underscores the panel's indefensible disregard of *Goodyear*. The concurrence mischaracterizes the Court's "notation" about equality of treatment between federal and non-federal facilities as merely a background "fact" about the Ohio law at issue that the Court "highlighted." *See* Concurrence at 12–13. Having done so, the concurrence then simply dismisses "the Court's notation that the Ohio statute was generally applicable" as "not part of the holding in *Goodyear*" and therefore "not controlling in this case." *See id*. at 12–13. These evasive maneuvers are insufficient to liberate the panel from the binding force of what the *Goodyear* Court said the statutory language *means*. When the Supreme Court tells us that the words of § 3172(a) "compel[]" the "same" award at a federal facility as would be received at a "wholly private facility," *see Goodyear*, 486 U.S. at 183, we are bound to follow that construction, whether we like it or not. The panel seriously erred in refusing to follow *Goodyear*.

**2**

Second, the panel held that its reading of § 3172(a) was supported by our decision in *United States v. Lewis County*,

---

long as in drawing these distinctions they do not discriminate against the Federal Government.

175 F.3d 671 (9th Cir. 1999). *See* 971 F.3d at 863–64. In fact, *Lewis County* squarely refutes the panel's analysis.

At issue in *Lewis County* was Washington's property tax scheme, which taxed federal property "whenever authorized by federal law." 175 F.3d at 675. Relying on 7 U.S.C. § 1984, Washington extended its property tax to properties held by the federal Farm Service Agency ("FSA"), but the FSA brought suit, contending that the tax was not authorized by § 1984 and that it violated the doctrine of intergovernmental immunity. *Id*. at 674. The wording of § 1984's authorization of state taxation was similar to § 3172(a): a State could tax "FSA property only 'in the same manner and to the same extent as other property is taxed.'" *Id*. at 675 (quoting 7 U.S.C. § 1984). The Government conceded that, except as to three of the FSA's parcels, the tax was uniformly applied to FSA property in exactly the same way that it was applied to *private* property, but it nonetheless argued that Washington engaged in impermissible discrimination against the Federal Government by exempting state and local government property from the property tax. *Id*.

We rejected this argument, which impermissibly attempted to rewrite § 1984 as if it required equal treatment with "'other *publicly held* property,'" as opposed to equal treatment with "'other property.'" *Id*. (emphasis added). We noted that Congress was surely aware that "states uniformly exempt state and local property from taxation," and so the Government's reading would render § 1984 a dead letter. *Id*. Moreover, it would make no sense to insist that state governments "engage in a circular process of taxing themselves in order to impose the tax on the federal government that Congress has authorized." *Id*. at 676. We therefore concluded that § 1984's requirement that the tax be

applied "in the same manner and to the same extent as other property" was satisfied because Washington "taxed FSA property *just as it taxed other non-exempt property*," *i.e.*, private property. *Id*. at 675.

Noting only that *Lewis County* authorized a distinction between FSA-owned property and *state-owned or local-government-owned* property, the panel claimed that *Lewis County* thus imposed no anti-discrimination requirement at all, and the panel therefore held that the similarly worded language in § 3172(a) must be read the same way. *See* 971 F.3d at 863–64. But as the above discussion of *Lewis County* makes clear, the panel's reading of that decision is demonstrably wrong. *Lewis County* expressly applied a non-discrimination principle, concluding that the comparable language of § 1984 required the State to tax FSA-owned property "just as it taxed" *private* property. 175 F.3d at 675; *see also id*. at 676 (expressly noting that, because "the County's tax on FSA-owned farmland *is also imposed on privately-owned farmland in general*," the State "taxed *private* farmland to the same extent, and in the same manner, as it taxed FSA farmland" (emphasis added)). Indeed, immediately after quoting the language of § 1984, the *Lewis County* court expressly described that language as establishing a non-discrimination requirement: "Thus, state and local authorities may apply a *nondiscriminatory* tax to property acquired by the FSA through loan default." *Id*. at 674 (emphasis added). It simply blinks reality to claim that *Lewis County* did not adopt a non-discrimination principle.

Moreover, *Lewis County*'s non-discrimination discussion included a footnote stating that, in a later section of the opinion, the court addressed the FSA's further argument that "the state has improperly taxed three of its farmland parcels at a higher, non-agricultural rate."

175 F.3d at 676 n.5 (emphasis added). In the cross-referenced discussion, *Lewis County* noted that the proper classification of the parcels was governed in the first instance by state law, but it went on to instruct the district court *also* to determine, "purely as a matter of federal law," "*whether the County has discriminated against the United States* in the establishment or implementation of its rules." *See id*. at 679 (emphasis added). This was not, as the concurrence implausibly contends, an instruction to determine whether the State had "discriminated against the United States" by treating the Federal Government differently *from itself. See* Concurrence at 16–17. Rather, it was an instruction to determine whether the State had applied the generally applicable state-law classification rules that govern all other parcels in a *different* way that "discriminated *against the United States*." 175 F.3d at 679 (emphasis added). This holding further flatly disproves the panel's contention that *Lewis County* did not adopt an anti-discrimination requirement. And it makes all the more troubling the fact that the panel's opinion in this case did not acknowledge *Lewis County*'s anti-discrimination holding.

The concurrence likewise errs in emphasizing *Lewis County*'s holding that § 1984 did not forbid discrimination between FSA property and *state-owned* property. *See* Concurrence at 15–16. The concurrence itself provides the reason why that discrimination was not prohibited: "In *Lewis County*, we interpreted the phrase 'other property' *not to include state-owned property*." *See id*. at 17 (emphasis added). Thus, the anti-discrimination requirement in the statute—which required that States tax federal property "in the same manner and to the same extent as *other property* is taxed," *see* 7 U.S.C. § 1984 (emphasis added)—simply did not apply to state-owned property. The statute imposed only a requirement of non-discrimination vis-à-vis private

property, and *Lewis County* noted that *that* requirement was satisfied (except as to the one issue it remanded). The panel's elimination of any non-discrimination requirement from § 3172 thus squarely conflicts with our decision in *Lewis County*.

**3**

Finally, the panel held that the concluding phrase in § 3172(a), which allows workers' compensation laws to be applied "as if the premises were under the exclusive jurisdiction of the State," grants States plenary authority to enact *any* such laws they want, including ones that facially discriminate against the Federal Government. 971 F.3d at 864–65. The panel's reliance on this phrase is unavailing, and it provides no basis for evading *Goodyear*.

Contrary to what the panel held, § 3172(a) does not "permit the State to apply its workers' compensation[] laws to federal land in the State 'as if' it were under the State's 'exclusive jurisdiction,' *without exception*." 971 F.3d at 865 (emphasis added). Rather, what the statute says is that States may only apply their workers' compensation laws "*in the same way and to the same extent as* if the premises were under the exclusive jurisdiction of the State." 40 U.S.C. § 3172(a) (emphasis added). The panel's flawed construction—*i.e.*, that § 3172(a) gives the States authority to enact any workers' compensation laws concerning the Federal Government "without exception"—ignores this italicized phrase and effectively reads it out of the statute. By construing the statute as granting plenary authority to "apply" workers' compensation laws "as if the premises were under the exclusive jurisdiction of the State," the panel's reading gives the phrase "in the same way and to the same extent" no work to do. That reading is therefore plainly wrong. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339

(1979) ("In construing a statute we are obliged to give effect, if possible, to every word Congress used."). The canon against surplusage applies with special force here, because the Federal Government's immunity from discriminatory treatment can be defeated only by a "clear and unambiguous authorization" of such discrimination. *Goodyear*, 486 U.S. at 180 (quotations omitted). A construction that excises part of the statute cannot possibly be a "clear and unambiguous" reading of the words.

Contrary to what the concurrence contends, my construction of the statute—which is, of course, the Supreme Court's construction in *Goodyear*—does not render surplusage the phrase "as if the premises were under the exclusive jurisdiction of the State." Rather, that phrase provides the baseline for comparison in *applying* the statute's non-discrimination principle: it means, as *Goodyear* confirms, that the State must provide for "the same workers' compensation award for an employee injured at a federally owned facility *as the employee would receive if working for a wholly private facility*." *Goodyear*, 486 U.S. at 183–84 (emphasis added). In other words, the phrase "as if the premises were under the exclusive jurisdiction of the State" means that the "workers' compensation laws" of the State are to be applied *without regard* to the fact that it is a federal facility. Washington's facially discriminatory law, of course, does the exact opposite.

For similar reasons, the panel was also wrong in suggesting that § 3172(a) only requires equivalence between the state laws applied to a federal facility and the laws that a State hypothetically *could* pass in regulating a non-federal project. *See Washington*, 971 F.3d at 865 (noting that Washington could pass a similar law to regulate state projects); Concurrence at 7 (insisting that "a state may enact

a workers' compensation scheme for federally-owned property as long as it *could* enact the same scheme 'in the same way and to the same extent' if the property were under the jurisdiction of the state"). Such a rule would make no logical sense, because it would effectively eliminate the non-discrimination requirement: it would allow a State to discriminate against the Federal Government so long as the State *could* have chosen to apply similar rules to other facilities—in other words, the State may discriminate so long as the State could have chosen *not* to discriminate.

The panel's reliance on hypothetical laws is also refuted by the statutory text, which says that the agency charged with enforcing "*the* workers' compensation laws" may apply "*the laws*" to federal property as specified. 40 U.S.C. § 3172(a) (emphasis added). It says nothing about comparing state laws discriminating against the Federal Government to the hypothetical laws that the State *could* adopt. The concurrence nonetheless insists that the statute's use of the phrase "as if" instructs courts to examine hypothetical laws, *see* Concurrence at 10 n.2, but that is wrong. What is hypothesized by the use of "as if" in the statute is *only the status of the property* and *not* the laws to be applied to it. By its plain terms, § 3172(a) instructs a State to apply "the state workers' compensation laws"—not some hypothetical law that does not exist—"in the same way and to the same extent *as if* the premises were under the exclusive jurisdiction of the State." 40 U.S.C. § 3172(a) (emphasis added).

The concurrence relies on a colorful example to explain how the panel decision's focus on hypothetical state laws would work, but the example only serves to underscore the panel's clear and deeply troubling error. The concurrence explains that, if the *state Constitution* "contains a provision

stating that 'workers' compensation payments to state employees may not exceed $100,000," then a State could not apply a discriminatory rule that federal park rangers who are attacked by bears get $1,000,000, because "Washington *could not* apply" such a rule "to state park rangers." *See* Concurrence at 8–9. The concurrence's focus on hypothetical state constitutional limits is odd, because the statute requires that awards against the Federal Government must be the same "as the employee *would receive* if working for a wholly private facility," *Goodyear*, 486 U.S. at 183–84 (emphasis added), not what the employee "*could* receive" under some hypothetical state law that does not exist.[3] Moreover, the panel's hypothetical implies that, *absent* its mythical state constitutional limit of $100,000 for workers' compensation benefits—which, of course, no State has— then § 3172 *would* permit a State to adopt a discriminatory rule in which state park rangers would receive $100 for a work-related injury while *federal* park rangers would receive $1,000,000. *See* Concurrence at 8–9 (italicizing the "and" in explaining that the state constitutional limit is loadbearing in the panel's hypothetical). This head-snapping suggestion confirms that the panel's statutory analysis is profoundly flawed.

The concurrence is also wrong in arguing that, had Congress wanted to prevent States from discriminating against the Federal Government in their workers' compensation laws, then it could have chosen different language that would have conveyed that meaning "'in

---

[3] The concurrence is therefore simply wrong in contending that *Goodyear* somehow endorsed the panel's peculiar position that § 3172(a) allows States to do whatever they want to the Federal Government so long as they "could" do the same to a non-federal facility. *See* Concurrence at 13 n.5.

unmistakable terms.'" *See* Concurrence at 11 n.3; *see also Washington*, 971 F.3d at 864–65 (making a similar point). This flips the governing canon of construction on its head. The question here is not whether § 3172(a)'s non-discrimination requirement could have been stated more clearly. The question is, conversely, whether Congress provided "'*clear and unambiguous*' authorization" affirmatively allowing such discrimination. *Goodyear*, 486 U.S. at 180 (emphasis added) (citation omitted). It did not.

## III

The direct financial consequences of the panel's decision may be substantial, underscoring the importance of this case. And under the panel's decision, any State in the Ninth Circuit is now also presumably free to impose its own highly burdensome and facially discriminatory workers' compensation rules against the Federal Government. The concurrence nonetheless belittles the impact of the decision, noting that, unlike the Bank of the United States in *McCulloch*, no federal entity is threatened with elimination here. *See* Concurrence at 17–18. But the fact that the Federal Government in 2021 is large enough to absorb Washington's substantial financial hit here does not in any way justify the panel's unprecedented betrayal of the bedrock principles established in *McCulloch*.

Moreover, the implications of the panel's decision extend well beyond § 3172 and the workers' compensation context. As the panel stated in its opinion, "we are presented with a congressional waiver of immunity that contains similar text—*i.e.*, 'in the same way and to the same extent'— that *we have already understood to permit a 'distinction' based on federal status*," and the panel held that courts confronting other such statutes "ought to interpret similar

language in the same way, unless context indicates that they should do otherwise." 971 F.3d at 864 (citing *Lewis County*). The panel's pronouncement that the phrase "in the same way and to the same extent" should henceforward be construed "to permit a 'distinction' based on federal status" could have very sweeping implications indeed. Many statutes use the same sort of wording at issue here, including the tax statute at issue in *Lewis County*. The panel's egregious error is one that should have been nipped in the bud by granting rehearing en banc.

\* \* \*

For the foregoing reasons, I respectfully dissent from the denial of rehearing en banc.

---

## OPINION

M. SMITH, Circuit Judge:

The Hanford site is a decommissioned federal nuclear production site that sprawls over more than five hundred square miles in southeastern Washington State. While active between 1944 and 1989, the Hanford site produced nearly two-thirds of the nation's weapons grade plutonium for use in the United States nuclear program during World War II and the Cold War. The site also generated significant amounts of highly radioactive and chemically hazardous waste. The United States Department of Energy (DOE) has overseen cleanup of the Hanford site since 1989, primarily relying on private contractors and subcontractors to perform the actual cleanup work. These cleanup operations are expected to last for at least six more decades.

Employees of private contractors working on federal land, like the employees of the DOE contractors who work at the Hanford site, may pursue state workers' compensation claims. 40 U.S.C. § 3172; Wash. Rev. Code § 51.12.060. The DOE has chosen to insure such claims for most of its contractors at the Hanford site. In 2018, Washington amended its workers' compensation scheme by enacting HB 1723, a law that applies only to Hanford site workers who work directly or indirectly for the United States. 2018 Wash. Sess. Laws 226 (codified at Wash. Rev. Code § 51.32.187). HB 1723 establishes for these workers, *inter alia*, a presumption that certain conditions and cancers are occupational diseases, which is rebuttable by only clear and convincing evidence. Wash. Rev. Code § 51.32.187(2)(a), (b).

Concerned about "heightened liability," the United States sued Washington[1], claiming that HB 1723 impermissibly directly regulates and discriminates against the Federal Government and those with whom it deals in violation of the doctrine of intergovernmental immunity. The district court granted summary judgment for Washington, pursuant to a congressional waiver of immunity that authorizes the States to apply their workers' compensation laws to "all" federal land and projects in the states "in the same way and to the same extent as if the premises were under the exclusive jurisdiction of the State[.]" 40 U.S.C. § 3172. The United States appeals. We hold that HB 1723 falls within § 3172's waiver and, thus,

---

[1] The Defendants are the State of Washington, Washington Governor Jay Inslee, the Washington State Department of Labor and Industries (DLI), and DLI Director Joel Sacks. We refer collectively to them as "Washington" and "the State."

does not violate the doctrine of intergovernmental immunity. We, therefore, affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

## I.  Factual Background

### A.  The Hanford Site Cleanup

The Hanford site cleanup is, in the DOE's words, "unprecedented in its scale and complexity." The liquid waste that the site generated—over fifty million gallons—is stored in 177 underground holding tanks, most of which are over seven decades old. The site also produced 270 billion gallons of contaminated groundwater, twenty-five million cubic feet of buried or stored solid waste, 2,300 tons of spent nuclear fuel, and twenty tons of plutonium bearing materials. There are roughly 10,000 DOE contractor employees at the Hanford site, some of whom perform the cleanup operations. Individuals working at the Hanford site cleanup operations face exposure to radioactive substances and hazardous chemicals.

### B.  Washington's Workers' Compensation Scheme

The Washington Industrial Insurance Act (WIIA) is the State's workers' compensation and industrial insurance regime. *See* Wash. Rev. Code § 51.04.10 *et seq*. The WIIA establishes a statutory mechanism for workers that have suffered injury or contracted an "occupational disease," *id.* § 51.08.140, caused by their employment to seek compensation through an award of benefits. *Dennis v. Dep't of Labor & Indus. of State of Wash.*, 745 P.2d 1295, 1301 (Wash. 1987).

Since 1937, the WIIA has covered employees of private contractors who work on federal land located in the state. *See* An act relating to workmen's compensation, ch. 147, 1937 Wash. Sess. Laws 525 (codified as amended at Wash. Rev. Code § 51.12.060).[2]  The State extended its workers' compensation laws to the employees of federal contractors following the enactment of 40 U.S.C. § 290, the former federal law that authorized states to apply their workers' compensation laws to federal land and projects located within the state.[3]  Wash. Rev. Code § 51.12.060.  Thus,

---

[2] In its present form, Washington Revised Code § 51.12.060 provides that:

> The application of this title and related safety laws is hereby extended to all lands and premises owned or held by the United States of America, by deed or act of cession, by purchase or otherwise, which are within the exterior boundaries of the state of Washington, and to all projects, buildings, constructions, improvements, and property belonging to the United States of America, which are within the exterior boundaries of the state, in the same way and to the same extent as if said premises were under the exclusive jurisdiction of the state, and as fully as is permitted under the provisions of that act of the congress of the United States approved June 25, 1936, granting to the several states jurisdiction and authority to apply their state workers' compensation laws on all property and premises belonging to the United States of America, . . . PROVIDED, That this title shall not apply to employees of the United States of America.

[3] Section 290 provided, in relevant part, that:

> [W]hatsoever constituted authority of each of the several States is charged with the enforcement of and requiring compliances with the State workmen's compensation laws of said States and with the

employees of DOE contractors and subcontractors at the Hanford site may pursue state workers' compensation claims. The WIIA, however, does not cover DOE's own employees. *Id.*

In 1997, Washington amended the WIIA to permit the DLI to approve, upon the request of the United States Secretary of Defense or the Secretary of the DOE, "special insuring agreements providing industrial insurance coverage for workers engaged in the performance of work, directly or indirectly, for the United States regarding projects and contracts at the Hanford Nuclear Reservation." 1997 Wash. Sess. Laws 573 (codified at Wash. Rev. Code § 51.04.130). The DOE has paid the benefits awards and administrative costs of workers' compensation claims for the employees of many of its contractors and subcontractors pursuant to contractual obligations as well as pursuant to memoranda of understanding (MOU) with the State. The DOE and Washington entered into the most recent MOU after Washington enacted HB 1723. Private contractors not covered by an MOU provide workers' compensation

enforcement of and requiring compliance with the orders, decisions, and awards of said constituted authority of said States shall have the power and authority to apply such laws to all lands and premises owned or held by the United States of America by deed or act of cession, by purchase or otherwise, which is within the exterior boundaries of any State and to all projects, buildings, constructions, improvements, and property belonging to the United States of America, which is within the exterior boundaries of any State, in the same way and to the same extent as if said premises were under the exclusive jurisdiction of the State within whose exterior boundaries such place may be.

Act of June 25, 1936, ch. 822, 49 Stat. 1938.

coverage through the State workers' compensation fund or as self-insurers.

## C.  HB 1723

This case concerns HB 1723's amendments to the WIIA. The law applies to "United States department of energy Hanford site workers" and "Hanford site workers," defined as:

> [A]ny person, including a contractor or subcontractor, who was engaged in the performance of work, either directly or indirectly, for the United States, regarding projects and contracts at the Hanford nuclear site and who worked on the site at the two hundred east, two hundred west, three hundred area, environmental restoration disposal facility site, central plateau, or the river corridor locations for at least one eight-hour shift while covered under this title."

Wash. Rev. Code § 51.32.187(1)(b).[4]  It is estimated that the law may cover some 100,000 persons.

HB 1723 creates a "prima facie presumption" for "United States [DOE] Hanford site workers" that certain "diseases and conditions" are "occupational diseases" under the WIIA.     *Id.*   § 51.32.187(2)(a);   *see   also   id.* §§ 51.32.187(3)     (identifying     certain     conditions),

---

[4] "Hanford nuclear site" and "Hanford site" are defined to mean "the approximately five hundred sixty square miles in southeastern Washington state" excluding certain leased lands, state-owned lands, and lands owned by the Bonneville Power Administration, which is owned by the United States[.]"  Wash. Rev. Code § 51.32.187(1)(a).

51.32.187(4) (specifying the requirements for and application of the presumption to certain cancers). An employer may rebut the presumption by "clear and convincing evidence," which includes the "use of tobacco products, physical fitness and weight, lifestyle, hereditary factors, and exposure from other employment or nonemployment activities." *Id.* § 51.32.187(2)(b). The presumption applies "following termination of service for the lifetime of" a covered worker. *Id.* § 51.32.187(5)(a). A covered worker or the survivor of a deceased covered worker may refile a previously denied claim. *Id*. § 51.32.187(5)(b). In addition, a claimant may recover reasonable costs, including attorney's fees, in any appeal that results in a benefits award when the presumption applies. *Id*. § 51.32.187(6).

## II. The District Court Proceedings

The United States brought suit for declaratory and injunctive relief against Washington, claiming that HB 1723 discriminates against the Federal Government and directly regulates it in violation of the doctrine of intergovernmental immunity. On cross motions, the district court granted summary judgment for the State. The court reasoned that 40 U.S.C. § 3172's waiver of immunity permits the State "to use the same power it possesses to craft workers compensation laws for non-federal employees to address injured employees on federal land," including "the ability to legislate, in a piecemeal fashion, to address specific risks to employees in specific industries." The United States timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo a district court's decision on cross motions

for summary judgment. *Empire Health Found. v. Azar*, 958 F.3d 873, 882 (9th Cir. 2020). Statutory interpretation is a question of law that we review de novo. *Comcast of Sacramento I, LLC v. Sacramento Metro. Cable TV Comm'n*, 923 F.3d 1163, 1168 (9th Cir. 2019).

## ANALYSIS

## I.  The Doctrine of Intergovernmental Immunity

The United States' claims against Washington invoke the doctrine of intergovernmental immunity. That doctrine "derive[s] from the Supremacy Clause of the Federal Constitution, U.S. Const., art. VI, which mandates that 'the activities of the Federal Government are free from regulation by any state.'" *United States v. California*, 921 F.3d 865, 878 (9th Cir. 2019) (quoting *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014)), *cert. denied*, —S. Ct.—, 2020 WL 3146844 (U.S. June 15, 2020). The doctrine traces its origins to "the Supreme Court's decision in *McCulloch v. Maryland*, which established that 'the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government.'" *U.S. v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819)). Pursuant to the doctrine, "state laws are invalid if they 'regulate[] the United States directly or discriminate [ ] against the Federal Government or those with whom it deals.'" *Boeing*, 768 F.3d at 839 (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality decision)). This is so "*unless* Congress provides 'clear and unambiguous' authorization for such regulation." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) (quoting *EPA v. State*

*Water Res. Control Bd.*, 426 U.S. 200, 211 (1976)) (emphasis added).

By its terms, HB 1723 is a state workers' compensation law that applies only to individuals who perform work at the Hanford site "directly or indirectly, for the United States." Wash. Rev. Code § 51.32.187(1)(b).  Both sides agree that § 3172 waives the Federal Government's immunity from state workers' compensation laws.  Our understanding of § 3172's predecessor statute would support that conclusion. *See Begay v. Kerr-McGee Corp.*, 682 F.2d 1311, 1319 (9th Cir. 1982) (concluding that 40 U.S.C. § 290 "unambiguously permits application of state workers' compensation laws to all United States territory within the state.").  The United States and Washington disagree, however, about whether § 3172 permits workers' compensation laws that apply uniquely to the workers of those with whom the Federal Government deals.  Our resolution of § 3172's scope will determine whether HB 1723 falls within the waiver and, thus, whether HB 1723 violates the doctrine of intergovernmental immunity.

## II.  Section 3172's Waiver of Immunity Encompasses HB 1723

To ascertain § 3172's scope, we "begin[] with the plain language of the statute." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009).  "[W]e examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy." *United States v. Lillard*, 935 F.3d 827, 833 (9th Cir. 2019) (citation omitted). Section 3172(a) provides that:

> The state authority charged with enforcing and requiring compliance with the state workers' compensation laws and with the

>orders, decisions, and awards of the authority
>may apply the laws to all land and premises
>in the State which the Federal Government
>owns or holds by deed or act of cession, and
>to all projects, buildings, constructions,
>improvements, and property in the State and
>belonging to the Government, in the same
>way and to the same extent as if the premises
>were under the exclusive jurisdiction of the
>State in which the land, premises, projects,
>buildings, constructions, improvements, or
>property are located.

40 U.S.C. § 3172(a).

We do not consider the meaning of this text on a blank slate. In *Goodyear Atomic Corp. v. Miller*, the Supreme Court addressed the predecessor statute to § 3172. In *Goodyear*, a private contractor operating a federally owned nuclear production facility challenged an Ohio workers' compensation law that provided a supplemental workers' compensation award for injuries resulting from an employer's violation of a state safety regulation. 486 U.S. at 176. Assuming that the Ohio law was "sufficiently akin to direct regulation . . . to be potentially barred by the Supremacy Clause," the Court concluded that "§ 290 provides the requisite clear congressional authorization for the application of the provision to workers at the Portsmouth facility."[5] *Id.* at 182.

---

[5] The United States does not explain here how HB 1723 directly regulates the Federal Government by adopting a presumption to determine whether a given "Hanford site worker" is entitled to receive a workers' compensation award pursuant to the WIIA. As in *Goodyear*,

To arrive at that conclusion, the Court rejected the argument raised by the private contractor and the United States Solicitor General that the statute's use of the phrase "workmen's compensation laws" was "not intended to include the additional-award provision in Ohio's workers' compensation law." *Id.* at 183. The Court observed that the statute did not define the phrase "workmen's compensation laws." *Id.* Focusing on the essential terms of the statutory text, including the phrase "in the same way and to the same extent as if said premises were under the exclusive jurisdiction of the State," the Court stated unequivocally that the statute "place[d] *no express limitation* on the type of workers' compensation scheme that is authorized." *Id*. (emphasis added). Rather than limiting the authorized workers' compensation laws, the Court explained that "[o]n its face, § 290 compel[led] the same workers' compensation award for an employee injured at a federally owned facility as the employee would receive if working for a wholly private facility." *Id*. at 183–84.

As the United States concedes, § 3172 is materially identical to its predecessor.[6] But the United States homes in

we will assume that HB 1723 is "sufficiently akin to direct regulation" of the Federal Government to trigger the doctrine of intergovernmental immunity. 486 U.S. at 182.

[6] There are some differences between § 3172 and its predecessor. Unlike its predecessor, § 3172 does not refer to "workmen's compensation laws," but rather "workers' compensation laws." And, instead of providing that the state workers' compensation authority "*shall* have the power and authority to apply" workers' compensation laws, Congress has provided that the state authority "*may* apply" such laws. This change signifies nothing more than that a state may, in its discretion, opt to apply its workers' compensation laws to federal premises in the state. *Fernandez v. Brock*, 840 F.2d 622, 632 (9th Cir. 1988) ("'May' is a permissive word, and we will construe it to vest

on the phrase "in the same way and to the same extent" to claim that § 3172 is a "very limited waiver" of immunity. The United States reads this text and *Goodyear* as "strongly suggest[ing]" that § 3172 authorizes only the "extension of generally applicable laws," rather than "discrete" state laws that "single out" the Federal Government and its contractors. We disagree.

The plain text of § 3172 does not purport to limit the workers' compensation laws for which it waives intergovernmental immunity to only those that are "generally applicable." We are not free to add text to a statute that is not there. *Ariz. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006). Like its predecessor, § 3172 does not define the phrase "state workers' compensation laws" and otherwise "places *no express limitation* on the type of workers' compensation scheme that is authorized." *Goodyear*, 486 U.S. at 183 (emphasis added). The Court's application of the predecessor statute in *Goodyear* does not warrant a different reading of the statute. To be sure, the Court considered there a state workers' compensation law that did not concern a particular employer, or a particular site located in the state, like HB 1723 does. *Id.* at 183–85. But the Court did not purport to impose the limitation on the statute that the United States seeks to impose here; indeed, the Court recognized that the statute placed no express limitation on permissible workers' compensation laws. *Id*. at 183. We cannot properly construe § 3172 in a way that would conflict with that understanding of a materially identical statutory provision.

___

discretionary power absent a clear indication from the context that Congress used the word in a mandatory sense.").

Equally unavailing is the United States' assertion that the phrase "in the same way and to the same extent" codifies a nondiscrimination rule that limits § 3172's waiver. Our decision in *United States v. Lewis County*, 175 F.3d 671 (9th Cir. 1999), is illustrative.

In *Lewis County*, we considered the application of a federal statute that "waives the immunity of the federal government from state taxation by authorizing state and local governments to tax . . . property owned by the federal Farm Service Agency ('FSA') 'in the same manner and to the same extent as other property is taxed.'" *Id*. at 673 (quoting 7 U.S.C. § 1984). In relevant part, the United States challenged a Washington county's taxation of FSA-owned land. The United States argued that the county had discriminated against a federal agency in violation of § 1984 and the doctrine of intergovernmental tax immunity because the county did not tax a comparable state agency. *Id*. at 674–75. We rejected that argument because "Congress ha[d] made its assessment of the federal interest in [] § 1984[.]" *Id*. at 676. We explained that, by virtue of that statute, Congress had "sufficiently qualifie[d] the intergovernmental immunity of the United States to permit the state to make the distinction it has." *Id*. We saw "no reason why state or local governments [had to] engage in a circular process of taxing themselves in order to impose the tax on the federal government that Congress has authorized." *Id.*

Echoing its arguments in *Lewis County*, the United States argues here that HB 1723 violates the doctrine of intergovernmental immunity because it discriminatorily applies only to Hanford site workers who work indirectly or directly for the Federal Government, without any application to state or private entities who perform work on or near the Hanford site. As in *Lewis County*, we are presented with a

congressional waiver of immunity that contains similar text—i.e., "in the same way and to the same extent"—that we have already understood to permit a "distinction" based on federal status. "A basic principle of interpretation is that courts ought to interpret similar language in the same way, unless context indicates that they should do otherwise." *Shirk v. United States ex rel. Dep't of Interior*, 773 F.3d 999, 1004 (9th Cir. 2014). The United States identifies no reason why we should depart from our understanding in *Lewis County*. As with the waiver there, Congress codified the federal interest in § 3172. This statute authorizes the States to apply workers' compensations laws to federal land located in the state without limitation and thus permits the distinction that HB 1723 draws.

In light of the United States' arguments here, a comparison of § 3172 with another waiver, namely the waiver contained in the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9620(a)(4), reinforces the conclusion that § 3172 does not codify a nondiscrimination rule.[7]

CERCLA waives the Federal Government's immunity from state laws concerning the removal and remediation of hazardous substances, but that waiver "shall not apply to the extent a State law would apply any standard or requirement to [Federal] facilities which is *more stringent* than the

---

[7] In addition to CERCLA, the district court contrasted § 3172 with 4 U.S.C. § 111, a waiver of intergovernmental tax immunity that expressly does not permit state and local taxation that "discriminate[s]" against United States' officers or employees simply because of their federal status. Section 3172, indeed, bears no semblance to that provision. Contrary to the United States' objection to this comparison, the comparison merely underscores that Congress knows how to limit a waiver in the same way that the United States asks us to read § 3172.

standards or requirements applicable to facilities which are not owned or operated by [the Federal Government]." 42 U.S.C. § 9620(a)(4) (emphasis added).   We held in *Boeing Co. v. Movassaghi* that this waiver did not save a California law that imposed "more stringent standards" on the Federal Government for the cleanup of a federal nuclear site located in California.  768 F.3d at 841–42.  Because we could locate no other congressional authorization, we concluded that the California law both directly regulated and discriminated against the Federal Government in violation of the Supremacy Clause and the doctrine of intergovernmental immunity.  *Id*. at 840–43.

Here, the United States seeks to import into the statutory phrase "in the same way and to the same extent" the limitation that Congress codified in CERCLA.  The United States avers that HB 1723 impermissibly applies "more stringent regulation" to the Federal Government.  And it argues that reading § 3172 to "authorize[] a state to enact laws that subject federal contractors, and only federal contractors, to more stringent standards than those of generally applicable state law" is "atextual."  Neither the text on which the United States focuses, nor any other text in § 3172, however, excepts from the waiver those state workers' compensation laws that are "more stringent" as applied to the Federal Government or those with whom it deals.  *Boeing* and its analysis are inapposite.

We arrive, finally, to considering the statutory text that the United States' reading of § 3172 omits: "as if the premises were under the exclusive jurisdiction of the State[.]"  40 U.S.C. § 3172.  We, of course, cannot ignore this text. *Ariz. State Bd. for Charter Sch.*, 464 F.3d at 1007 (stating that a court may not "subtract" statutory text).  And we must read it with the rest of the statutory text. *Davis v.*

*Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view toward their place in the overall statutory scheme.").

When the phrase "in the same way and to the same extent" is read with "as if the premises were under the exclusive jurisdiction of the State," it is evident that § 3172 removes federal jurisdiction as a barrier to a state's authority over workers' compensation laws for all who are located in the state. *See Peak v. Small Business Admin.*, 660 F.2d 375, 376 n.1 (8th Cir. 1981) ("[S]tate workmen's compensation laws, as applied to private employers working on federal land, are freed from any restraint by reason of the exclusive federal jurisdiction."); *Capetola v. Barclay White Co.*, 139 F.2d 556, 559 (3d Cir. 1943) ("[T]he purpose and effect of the . . . Act was to free State workmen's compensation laws from the restraint upon their enforcement theretofore existing by reason of the exclusive federal jurisdiction of lands within the States[.]"), *cert. denied*, 321 U.S. 799 (1944); *Travelers Ins. Co. v. Cardilllo*, 141 F.2d 362, 363 (D.C. Cir. 1942) ("[T]he statute . . . revest[s] State jurisdiction which, presumably, Congress thought might be divested by the acquisition and ownership of the land by the United States for Federal purposes. The effect . . . is . . . to restore the status quo ante, and the purpose was to make sure that employees of contractors during work on a Federal building in a Federal area would be able to recover compensation benefits for disability or death.").

By removing federal jurisdiction as a barrier to application of state workers' compensation laws to those who work on federal land located in the State, § 3172 authorizes the State to apply to such land the authority it has over workers' compensation in its exclusive jurisdiction.

Subject to constitutional constraints, the States possess broad authority to enact laws that are reasonably deemed to be necessary to promote the health, safety, and general welfare of those in its jurisdiction, including workers' compensation laws. *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 172 (1972); *Mountain Timber Co. v. Wash.*, 243 U.S. 219, 238 (1917). We presume that Congress was aware of this authority when it fashioned § 3172 to permit the State to apply its workers' compensations laws to federal land in the State "as if" it were under the State's "exclusive jurisdiction," without exception. *Goodyear*, 486 U.S. at 184–85. Critically, as it did in the district court, the United States conceded during oral argument that Washington could enforce a version of HB 1723 that did not involve the Federal Government and where the Hanford site were a state project.[8] As we read it, § 3172 permitted Washington to enact and apply HB 1723 to federal contractors and their employees at the Hanford site.

It thus follows that, "when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1747 (2020). Section 3172 permits the State to apply workers' compensation laws to federal land located in the State, without limitation, and to make the distinction that it has drawn in HB 1723. Thus, HB 1723 falls within the scope of § 3172's waiver and does not violate the doctrine of intergovernmental immunity.

---

[8] The State also previously amended its workers' compensation laws to adopt a presumption applicable only to firefighters. Wash. Rev. Code § 51.32.185. Thus, it is not unprecedented for Washington to exercise its authority to fashion workers' compensation laws to adopt a presumption tailored to certain employment.

## III.    Remaining Issues

Notwithstanding the foregoing, we briefly explain why we decline to resolve two other issues raised by the parties.

First, the United States observes that the Federal Government has fashioned a program for workers injured by exposure to radiation and chemicals at DOE sites, pursuant to the Energy Employees Occupational Illness Compensation Program Act (EEOICPA), 42 U.S.C. § 7384 *et seq*., as amended by 118 Stat. 1811, 2178 (2004). Pursuant to the EEOICPA, the Federal Government has paid out more than $1.75 billion to Hanford workers as of June 2020.[9]  In the United States' view, EEOICPA "properly addresses concerns of this kind."  Although this argument sounds in preemption, the United States has waived that argument by not clearly and distinctly raising it.  *McKay v. Ingleson*, 558 F.3d 888, 891 n.5 (9th Cir. 2009).

Second, Washington argues that HB 1723 is rationally related to a government interest and thus is a constitutional exercise of its authority even if the law discriminates against those who deal with the Federal Government.  This argument correctly recognizes that state authority is subject to constitutional constraints, including the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *Weber*, 406 U.S. at 172; *Mountain Timber Co.*, 243 U.S. at 243–45.  But the only claims the United States raised in this case concern whether HB 1723 violates the doctrine of intergovernmental immunity.  We need not go further than

---

[9] *See* United States Dep't of Labor, *Total Benefits Paid by Facility, Cumulative EEOICPA Compensation and Medical Paid – Hanford* (June 30, 2020), available at https://www.dol.gov/owcp/energy/regs/compliance/charts/hanford.htm.

§ 3172 to resolve those claims.  *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 197 (2009) ("Our usual practice is to avoid the unnecessary resolution of constitutional questions.").

## CONCLUSION

We hold that HB 1723 falls within § 3172's waiver of the Federal Government's immunity from state workers' compensation laws, and thus does not violate the doctrine of intergovernmental immunity.  Consequently, Washington was entitled to summary judgment on the United States' claims.

**AFFIRMED.**